STATE ex rel. ASSOCIATION FOR the PRESERVATION OF TENNESSEE ANTIQUITIES et al., Appellants-Plaintiffs,

v.

CITY OF JACKSON et al., Appellees-Defendants.

Supreme Court of Tennessee.

Nov. 27, 1978.

James G. Woodall, Jackson, Michael R. Lipscomb, Randi B. Rich, Henderson, for appellants-plaintiffs.

Robert E. Alderson, Russell Rice, Jackson, for appellees-defendants.

## OPINION

HARBISON, Justice.

In this case appellants challenge the action of the City of Jackson in leasing the "Home of Casey Jones" Museum, a municipally-owned facility, to a private enterprise for profit. The Chancellor sustained the validity of the lease. After careful consideration of the contentions of the parties, we affirm his decision.

The record is, in some respects, meager. The City of Jackson apparently acquired certain real estate situated on West Chester Street, lying within the corporate limits, in 1956. This property had been the residence of a famed railway engineer, John Luther "Casey" Jones, who was killed in a train collision on April 30, 1900. The incident was memorialized and achieved status as a cherished legend of the railroading industry through a popular ballad published some years later.

The deed by which the City acquired the Jones residence is not in the record. However, it is not contended that the City acquired anything other than unrestricted fee simple title to the property. There is no insistence that the instrument of conveyance contained any trust provision or limitation upon the use which the municipal government might make of the land and residence.

We are advised by counsel that at some time after the acquisition of the Jones residence, the City also acquired an adjacent tract on which there has been situated for several years a steam locomotive similar to that in which Jones was killed. This locomotive has been displayed along with the Jones residence and numerous artifacts contained therein, the museum representing the family lifestyle of railroad employees and pieces of equipment, publications, etc., typical of the age of steam railroading in the late nineteenth and early twentieth centuries.

Apparently, although again not explained in the record, the City acquired the right to use the name "Casey Jones" in connection with the operation of this museum. In the lease now under consideration, the City assigned to the lessee such rights as it had under an agreement with the widow of "Casey" Jones. The lease states that that agreement was executed on September 8, 1955, but it is not in the record or referred to in the testimony, so that we have no way of knowing its contents.

Under date of July 1, 1977, and, according to the testimony, pursuant to authority granted by the Board of Commissioners of the City, the subject lease was entered into between the City and a commercial corporation for a term of ten years, with provisions for two additional ten-year extensions. Under the terms of the lease the tenant guaranteed the City a base rental of $1500 per year, against ten percent of the gross annual admission receipts from the museum. The lessee was given the right to remove the residence, the locomotive and all other personal property belonging to the museum, together with any artifacts which were on loan to it, from its location on West Chester Street to premises owned by the tenant near the junction of Interstate Highway 40 and U.S. By-Pass # 45. That intersection is now in one of the busiest commercial areas of the City. The tenant already operates on its premises an "Old Country Store," an enterprise typical of general merchandising in small towns and rural areas near the close of the nineteenth centu-

ry. It has also erected and has leased premises for a number of other stores, specializing in jewelry, gifts, and other items of merchandise, the decor of these stores also being in the same general motif. The tenant proposes to operate the Casey Jones Museum on its premises, but as a separate enterprise, with independent accounting for revenues and expenses. The lease requires the tenant to keep the museum and all associated personal property in good repair, fully insured, and to advertise and promote it as a tourist attraction. The tenant is required to keep the museum open to the public throughout the entire year, during reasonable hours.

Appellants do not attack this particular lease as being improvident, uneconomical or unsuitable in any particular sense. There is no contention that any of the appellants, who are citizens and societies interested in historic preservation,[1] had sought and been denied an opportunity to purchase, lease or otherwise operate the museum properties, nor is there any attack upon the formal procedure by which the lease was authorized; that is, absence of a specific enabling ordinance, competitive bidding, or the like.

Rather, the attack is more general and consists of an assertion that since the museum was publicly owned and operated, the City had no legal authority to alienate or dispose of it. It is insisted by appellants that the City had acquired and operated the museum in its "governmental" capacity, and that therefore it could not properly lease the facility for operation by a private commercial enterprise. Appellants do not cite any general state statutes or any provisions of the Jackson charter in support of this contention.

Appellees insisted, and the Chancellor held, that the museum had been acquired by the City solely as a commercial venture, designed to attract tourists into the Jackson trading area. Accordingly the Chancellor concluded that the City held the museum in a "proprietary" capacity and that it had full legal authority to dispose of it as it saw fit.

There was filed in evidence a brief financial summary of the operation of the museum from the years 1956 through 1977. During each of those years, except 1960, the expenses of operation exceeded the gross revenues. Only in the year 1960 was a profit shown, revenues in that year being $11,601 and expenses $10,234, leaving a profit of $1,367. In all other years the deficits ranged from $2,400 to as much as $13,242, not including the initial year of operation, when losses were shown as $55,-571. This, however, apparently included initial investment costs as well as expenses of the first year's operations.

The museum was operated by the City not only as an attraction for tourists, but as a place of educational and cultural interest to its own citizens and school children. Under the terms of the lease, however, the tenant will be required to continue to operate the museum in essentially the same manner as it had been operated by the City, and at a location much more conducive to patronage by tourists.

Since its acquisition by the City, the museum has been operated on the original residential site, which in 1956 was adjacent to the downtown business and commercial district of Jackson. In the intervening years, with the advent of the interstate highway, intensive commercialization has developed to the north of the City. There have been changes in the character of the neighborhood where the museum was located, this having originally been a residential area typical of the early twentieth century. Now there are only a few residences in the neighborhood, and the construction of a commercial by-pass has rendered access to the museum difficult and less desirable for transient visitors to the area.

Much of the testimony of appellants concerned their interest in preserving the museum at its original site and the possible loss of its recognition by various societies and associations interested in the preserva-

1. This suit is actually brought as a quo warranto action, and the societies and individuals involved are the relators therein.

tion of antiquities and historic places. As stated previously, however, appellants have not attacked the lease as being improper or unwarranted, in any specific sense, but have simply averred that the City had no power to lease this municipally-owned property to a private corporation.

In this regard we are of the opinion that the contentions of the appellants are not well taken, and that their view of the authority of municipal corporations with respect to public properties is unduly restrictive.

Although most frequently discussed in cases involving municipal tort liability,[2] the terms "governmental" and "proprietary" have historically been used in a wide variety of cases in an attempt to describe the ownership of property and the conduct of activities by municipal corporations. It is therefore possible to find general statements to the effect that municipal corporations may sell or otherwise dispose of property held for "private" or "proprietary" purposes, but may not do so in respect to property held for "governmental" purposes unless expressly authorized by law. *See, e. g.,* 63 C.J.S. *Municipal Corporations* § 962 (1950); 56 Am.Jur.2d, *Municipal Corporations,* § 556 (1971).[3]

Although exceedingly difficult to define and to apply to specific cases, these terms have been utilized many times by the courts of this state in ruling upon the validity or invalidity of various transactions entered into by city and county governments. Appellants particularly rely upon the case of *Warren v. Bradley,* 39 Tenn.App. 451, 284 S.W.2d 698 (1955), in which a city built at public expense an addition to its sewer system. It then attempted to lease that addition to the developer of a subdivision for a term of twenty years, upon his reimbursing the city for its construction costs. The lessee was authorized to charge fees to private property owners desiring to tap onto the

sewer system. The city was obligated to maintain the connection between that addition and its principal sanitary sewer system throughout the term of the lease.

In that case the Court of Appeals held that the lease represented an improper exercise of municipal authority and declared it to be invalid. Although there was general language in the city charter authorizing it to sell, lease or dispose of public property, the Court held that:

"... this right must be held limited to the property it holds in its proprietary, and not governmental, capacity." 39 Tenn.App. at 459, 284 S.W.2d at 702.

The Court relied upon two earlier cases which had held that a county government could not properly lease for private purposes space in the register's office of the county courthouse, *Shelby County v. Memphis Abstract Company,* 140 Tenn. 74, 203 S.W. 339 (1918), or a part of the courthouse lawn, *Henry v. Grainger County,* 154 Tenn. 576, 290 S.W. 2 (1926).

The Chancellor cited the case of *Nashville Trust Co. v. City of Nashville,* 182 Tenn. 545, 188 S.W.2d 342 (1945), in which a city was held not liable for alleged negligence in failing to supply water to a sprinkler system installed in a private building. The building burned, and the city was sued for the fire loss. The Chancellor seemed to interpret that case as holding that the city was engaged in a "proprietary" function, but we do not so understand it. The Court held that even though the city made a special charge to owners of sprinkler systems, its furnishing water for fire prevention was a governmental, rather than a proprietary, function, so that the city could not be held for the alleged negligence of its employees. In addition the Court held that the city could not validly make a contract by which it would incur such liability in an area where the law granted it immunity.

---

**2.** *E. g., City of Memphis v. Bettis,* 512 S.W.2d 270 (Tenn.1974). The Tennessee Governmental Tort Liability Act has generally abandoned the distinction between governmental and proprietary functions insofar as responsibility for torts is concerned. T.C.A. § 23–3307.

**3.** For a collection of cases on the general subject of leases by municipal corporations, see Annot., 47 A.L.R.3d 19 (1973).

Although aware of its frequent use, we do not find the dichotomy of "governmental" and "proprietary" functions to be particularly helpful from the standpoint of legal analysis or to furnish a satisfactory basis upon which all of the cases can be explained or reconciled.

In the very early case of *Mayor and Aldermen of Memphis v. Wright*, 14 Tenn. 497 (1834), the City of Memphis laid off part of a dedicated public promenade on the banks of the Mississippi River for use as a steamboat landing, and other parts for the landing of flatboats and similar craft. A penal ordinance was enacted to prevent flatboats from landing in the area designated for steamboats. In a prosecution under this ordinance, the trial judge instructed the jury that if the area in question had not originally been laid off by the proprietors on the town plan as a public landing, then the city could not so designate it and the defendant would not be liable. Reversing, this Court said:

"The public property belongs to the corporators, and may be appropriated by them to any use they may think proper. The mayor and aldermen are the representatives of these corporators, and have vested in them all the right to dispose of, or apply to any use they may think proper, the public promenade, public squares, etc., which existed in the original proprietors. If this were not so, a thriving town would be exceedingly crippled in the exercise of its corporate rights. Few persons would have sufficient foresight, in laying off a town, to anticipate and provide everything that was calculated to promote its prosperity and good government. It must, therefore, be among the powers of a corporate town, having by its charter a right 'to do all things necessary to be done by corporations,' to lay off new streets, squares, lanes, and alleys, and to construct wharves and other conveniences for the trade and comfort of the citizens, and by ordinances to regulate the manner in which they shall be used. These powers are 'necessary to be done' that the prosperity of the town may be promoted, and that its peace and order may be preserved." 14 Tenn. at 499–500.

Similar language was used in the case of *Adams v. Memphis & Little Rock R.R. Co.*, 42 Tenn. 645 (1866), where the City of Memphis had received outright ownership of seventy-five acres of land, known as the "Navy Yard Property," by cession from the federal government. The city later undertook to pledge this property and to make it security for fifteen-year railroad bonds, in order to assist in the development of a railroad connecting Memphis and Little Rock, Arkansas. The transaction was upheld despite the fact that the railroad had its terminus on the west bank of the Mississippi River and did not enter the corporate limits of the city. The Court noted that the city was given broad power in its charter to hold, sell, lease and dispose of real and personal property, and the city charter authorized the city to engage in many different corporate activities. The Court stated that municipalities may not apply their property or funds "to any other than 'corporation purposes'." Quoting from an earlier case, it said:

" 'Every attempt to lay down an exact general rule, by which to determine what is a corporation purpose, must prove nugatory. The question must necessarily be decided in view of the facts of each particular case. And while we do not mean to say, that the judgment of the local government of the town is to be taken as conclusive of the question, whether the object proposed be a legitimate corporation purpose, yet we think it might, in general, be safely taken as *prima facie* evidence of the fact; for it will, perhaps be found, in most cases, that an intelligent board of aldermen are more capable of forming a correct judgment as to what measures are of a nature to promote, more or less directly, the general interests and prosperity of the town, than any other tribunal.' " 42 Tenn. at 655–656.

The Court found that the construction of the railroad conferred very substantial commercial benefits upon the Memphis trade area, and that the mortgaging of the city property to assist in that venture was for a legitimate "corporation purpose."

In the present case no question is raised as to the legality of the initial acquisition of the "Casey Jones Museum" by the City of Jackson or the propriety of its subsequent use by the City for the combined cultural, commercial and educational purposes shown in the record. It seems to us, therefore, at a minimum, that it was a matter of judgment to be exercised by the duly elected City officials as to whether the continued operation of that facility at a financial loss was or was not in the public interest and as to whether the leasing of the facility for operation under private management was or was not a suitable alternative. We find no abuse of discretion by the City officials in their decision to permit the removal of the residence and artifacts from their original site. The lease amply secures the City in the event of default by the tenant. The City may then terminate the lease on short notice and require the tenant to restore the properties to the original site or to any other public location. No question is raised in the present record as to the solvency or responsibility of the tenant.

Insofar as prior cases have held that cities are without authority to dispose of publicly owned facilities by lease, sale or otherwise, where the properties are held in a "governmental capacity," we are of the opinion that each case must be examined in the light of its own facts and circumstances. Obviously cities must be and legally are free, within their charter provisions, to dispose of outmoded, surplus or unprofitable properties, where these are not held under a grant imposing a specific trust or other limitation upon ownership or use.

In the present case the Jackson charter expressly confers upon the City, without limitation, the authority:

> "To acquire or receive and hold, maintain, improve, sell, lease, mortgage, pledge, or otherwise dispose of any property, real or personal, and any estate or interest therein, within or without the City or State."

The charter also contains language that its terms are not to be deemed restrictive and that they shall be construed

> ". . . so as to permit the City to exercise freely any one or more such powers as to any one or more such objects for any one or more such purposes."

We are not prepared to decide this case solely upon the proposition that the City may have acquired and held the "Casey Jones" Museum, in part at least, in a "proprietary" capacity. On the other hand, we are of the opinion that appellants have failed to demonstrate that the subject lease is contrary to the public interest, that it represents a misuse or abuse of the discretion and authority of the Board of Commissioners, or that it is in any other way *ultra vires* or beyond the legitimate charter powers of the City.

Accordingly the assignments of error are overruled, and the judgment of the Chancellor is affirmed at the cost of appellants.

HENRY, C. J., and COOPER, FONES and BROCK, JJ., concur.