# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 5, 2008 Session

## MIKE ALLMAND v. JON PAVLETIC, IND. AND AS MAYOR OF THE CITY OF RIPLEY, TENNESSEE ET AL.

**Rule 23 Certified Question of Law**
**United States District Court for the Western District of Tennessee**
**No. 06-2128 D P     Bernice Bouie Donald, Judge**

---

**No. M2008-00459-SC-R23-CQ - Filed August 26, 2009**

---

The United States District Court for the Western District of Tennessee has submitted a certified question of law pursuant to our Rule 23 as to the validity of certain provisions within two separate employment contracts:  "Whether a municipal utility board has the authority to enter into a contract with an appointed city official who serves at the will and pleasure of the Board of Mayor and Aldermen whereby the utility board contracts to continue to pay the official's salary for a multi-year time period [8 and 14 years] after the official's employment is terminated."  Because it is within our discretion to do so, we have elected to answer the question in a manner designed to fit the facts and circumstances in this particular case.  Our conclusion is that neither Ripley Power and Light nor Ripley Gas, Water, and Wastewater, utility boards for the City of Ripley, Tennessee, had the authority to enter into multi-year contracts with Mike Allmand, the former superintendent of the two utilities, or to obligate the City for the payment of salary and benefits as provided by the terms.

## Tenn.  Sup.  Ct.  R.  23 Certified Question of Law

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.  WILLIAM C. KOCH, JR., J. filed a separate dissenting opinion.

Tim Edwards and James F. Horner, Jr., Memphis, Tennessee, for the plaintiff, Mike Allmand.

Edward J. McKenney, Jr., Memphis, Tennessee, for the defendants, Jon Pavletic, Billy Chipman, Billie Anne Hendren, Jimmy Harrison, John Gaines, Robert T. Hightower, Ripley Gas, Water and Wastewater Department, and the City of Ripley; and Henry Clay Shelton, III, Memphis, Tennessee, for the defendant, Ripley Power and Light Company.

**OPINION**

In August of 2006, the Plaintiff, Mike Allmand ("Allmand"), filed a complaint in the United States District Court for the Western District of Tennessee seeking damages against the City of Ripley, Tennessee, its Mayor and Board of Aldermen, individually and in their official capacities, Ripley Power and Light Company, and the Ripley Gas, Water and Wastewater Department (collectively, the "Defendants"),[1] for the breach of two separate employment contracts. During the course of the litigation, the District Court entered an order certifying a question of law to this Court pursuant to Rule 23 of the Tennessee Supreme Court Rules.[2] Our recitation of the facts and procedural history is taken from the order entered by the District Court.

**Background**
**City of Ripley's Charter**

The City of Ripley, Tennessee, became an incorporated municipality pursuant to a Charter that was authorized by the Tennessee General Assembly in 1901 Private Acts, Ch. No. 223. The Charter provides for a Board of Mayor and Aldermen, consisting of seven members, one of whom serves as the Mayor. Pursuant to Section 5 of the Charter, the Mayor and other members of the Board of Mayor and Aldermen have terms of four years. Section 7 of the Charter includes the following language:

> Be it further enacted, that the City shall be organized into departments of general government, police, fire, gas and water, electricity, parks and recreation, and public works. However, the Board of Mayor and Aldermen may abolish any of those departments, may create new departments, and may combine, or consolidate or merge any present or future departments. The Board of Mayor and Aldermen shall appoint the heads of the departments, and *those heads of departments shall serve at the will and pleasure of the Board*.

(Emphasis added). Further, Section 17 of the Charter provides as follows:

> [T]he Board of Mayor and Aldermen may make all proper and necessary contracts for corporate purposes and uses, which shall be made in the name of the corporation, and signed by the Mayor and Recorder, and *no person shall have power to create any*

---

[1] The District Court's order refers to the latter two entities as "Ripley Power" and "Ripley Gas." In 2007, the certified population of Ripley was 7,844. Municipal Incorporation, County, Charter and Population Table, Tenn. Code Ann. Vol 13, at 250 (2008 Supp.).

[2] "The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 23, § 1.

*liability against the corporation except by express authority of the Board,* conferred at a meeting duly and regularly convened.

(Emphasis added).

### Electric Department

On December 6, 1957, the Board of Mayor and Aldermen, acting pursuant to authority granted by the Municipal Electric Plant Law of 1935, Tenn. Code Ann. § 7-52-101, et seq. (2005 & Supp. 2008) created a Board of Public Utilities ("Electric Department") as follows:

> [B]e it resolved by the Board of Aldermen of the City of Ripley that a Board of Public Utilities be, and it is hereby, constituted and established for the purpose of taking and having supervision and control of the improvement, operation, and maintenance of the City of Ripley's *Electric Department*, which said Board shall be the Supervisory Body of the said Department and shall have all the powers and duties which are, or shall be, conferred upon such Board of Supervisory Body by the laws of Tennessee, including, but not limited to, the provisions of said Municipal Electric Plant Act . . . .

(Emphasis added).

The resolution, which went into effect on January 1, 1958, provided that the Board governing the Electric Department would consist of three members, one of whom was a member of the City's Board of Mayor and Aldermen, with each serving a term of four years. Tenn. Code Ann. § 7-52-107. Pursuant to Tennessee Code Annotated section 7-52-114(b), the 1957 resolution further authorized the Electric Department's Board to select and remove a Superintendent: "The Superintendent shall serve at the pleasure of the Board and may be removed for cause by said Board at any time." See also Tenn. Code Ann. § 7-52-114(b) ("The superintendent shall serve at the pleasure of the supervisory body and may be removed by such body at any time.").

### Gas, Water and Sewer Department

On July 3, 1962, the Board of Mayor and Aldermen adopted a resolution establishing a Board of Public Utilities ("Gas Department") to supervise and control natural gas, water, and sewer facilities:

> [B]e it resolved by the Board of Mayor and Aldermen of Ripley that a Board of Public Utilities be, and it is hereby constituted and established for the purpose of taking and having supervision and control of the improvement, operation and maintenance of the City of Ripley's *gas, water and sewer plants*, which said Board shall be the Supervisory Body of the said plants and shall have all the powers and duties which are, or shall be, conferred upon such Board of Supervisory Body by the laws of Tennessee. . . .

(Emphasis added). The 1962 resolution created a Gas Department Board consisting of five members, one of whom is to be a member of the City's Board of Mayor and Aldermen. Like the Electric Department Board, the Board of the Gas Department was delegated the authority to select and remove a superintendent: "The Superintendent shall serve at the pleasure of the Board and may be removed for cause by said Board at any time, provided that such action is approved by [the] Board of Mayor and Aldermen." While the state statute applicable to the Electric Department directs that the superintendent "serve at the pleasure of" the board, there is no similar statutory provision applicable to gas, sewer, or water utilities. See Tenn. Code Ann. § 7-35-101, et seq. (2005 & Supp. 2008).

**The Contracts**

Beginning in the 1980s, Mike Allmand worked as the superintendent for both the City's Electric and its Gas Departments. In 1985, 1991, and 1996, Allmand, desirous of both job security and freedom from "political influence," sought and obtained five-year employment contracts. Each of the contracts contained, among other things, provisions whereby Allmand would continue to receive his full salary if terminated, regardless of the basis of the termination.[3]

On October 31, 2003, the Gas Department entered into a new employment agreement with Allmand, naming him "President and CEO" for an eight-year term and including the following additional language:

1. The [Gas Department] shall continue to employ Employee as President and CEO, and Employee hereby accepts and agrees to such continued employment . . . .

. . . .

3. The initial term of this Agreement shall be for a period beginning on the date it is signed by the parties and ending on October 31, 2011. *This Agreement shall automatically renew for successive five-year terms*, provided that neither party submits written notice of termination six (6) months prior to the termination date. . . .

. . . .

12. *In the event that the Employer terminates Employee's employment for any reason during the term of this Agreement, or any successive term, Employee shall be entitled to receive Employee's annual salary, compensation, and all benefits for the remaining term of the Agreement or a period of five years from the date of the Employee's termination, whichever is greater*; provided however, that if the

---

[3] In June of 2003, the Division of Municipal Audit for the State of Tennessee advised the City that the post-termination benefits in the employment contracts "did not appear to serve a valid municipal purpose." The audit also reported that provisions allowing Allmand's spouse expenses for travel, meals, and entertainment were "void."

Employer can prove beyond a reasonable doubt that Employee voluntarily abandoned his job or engaged in intentional conduct that operated to the specific detriment of the Employer's welfare, that the Employer may terminate this Agreement without obligation to provide the above-noted severance payments. In the event of a termination prior to the expiration of the Agreement, payments under this provision shall be paid pursuant to the Employer's normal bi-weekly schedule. For purposes of this provision, the annual salary, compensation, bonuses and benefits shall equal the Employee's salary, compensation, bonuses and benefits existing at the time of his termination but in no case to be less than the salary, compensation, bonuses and benefits Employee received during the year prior to his termination. The term benefits shall include, but not be limited to, medical insurance, life insurance, pension and supplemental pension plans, social security, and disability insurance. Employee shall be paid any and all accumulated sick leave and vacation, and any other accrued benefits, in a single lump sum if Employee leaves Company for any reason. . . .

(Emphasis added).

Similarly, on December 11, 2003, the Electric Department entered into a fourteen-year employment contract with Allmand, providing for automatic renewal after the original term for successive periods of one year, on the condition that "neither party submits written notice of termination at least one (1) year prior to the termination date." Paragraph 14 of the Electric Department contract contained a post-termination payment provision similar to that in paragraph 12 of the Gas Department contract. The only other significant differences between the two contracts were that paragraph 14 did not include a provision allowing for "a period of five years from the date of the Employee's termination, whichever is greater" and did not use the term "above-noted severance payments."

Both contracts provided that Allmand "was being called upon to manage the two departments as they were merged." The contracts also included identical severability clauses: "Should any section or portion of this Agreement be held unreasonable or unenforceable by a court of competent jurisdiction, such decision of the court shall apply only to the specific section or portion involved and shall not invalidate the remaining sections or portions of this Agreement."

On November 7, 2005, Allmand was discharged as superintendent of the Gas and Electric Departments. He was not paid a post-termination salary and received no other benefits as provided within the contracts.

### District Court Proceedings

On August 31, 2006, some ten months after being discharged from his positions of employment, Allmand filed a complaint in the United States District Court for the Western District of Tennessee against the Defendants, seeking damages for the breach of each of the two contracts.

On July 23, 2007, the District Court granted partial summary judgment for the Defendants, ruling that "the Ripley City Charter and the Municipal Electric Plant Act, Tenn. Code Ann. § 7-52-101, et seq. *did not allow the Utility Boards to enter into multi-year employment contracts with [Allmand], an appointed official who serves 'at the will and pleasure of the board*'" and that "in contracting with [Allmand] for definite term[s] of employment, *the Utility Boards acted ultra vires."* (Emphasis added). As a result, the District Court concluded that the October 31, 2003 and December 11, 2003 multi-year employment agreements were "voidable as to all provisions contingent on a definite term of employment" but were valid as to "those provisions not contingent upon a definite term of employment, such as compensation, retirement, and annual/sick leave." On August 7, 2007, the District Court entered an "Order of Clarification" which provided, in pertinent part, as follows:

> The Court finds that the issue of severance is not precluded by the . . . holding that the Board lacked the authority to contract for a term of years. *The issue of severance is not inconsistent with an at-will contract.* Accordingly, the issue of severance is not rendered moot by the Court's earlier Order.

(Emphasis added).

Later, the District Court entered an order certifying the following question of law pursuant to our Rule 23: "Whether a municipal utility board has the authority to enter into a contract with an appointed city official who serves at the will and pleasure of the Board of Mayor and Aldermen whereby the utility board contracts to continue to pay the official's salary for a multi-year time period [8 and 14 years] after the official's employment is terminated." The specific question, of course, is whether Allmand is entitled to compensation under the multi-year contracts if the City Charter or other provisions of law authorized the Electric and Gas Department Boards to offer employment only upon an at-will basis.

## Analysis
### Standard of Review
This case presents a certified question of law under Rule 23 of the Tennessee Supreme Court Rules. In reviewing a question of law, our review is *de novo* without a presumption of correctness. Tenn. R. App. P. 13; Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (citing Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997)); S. Contractors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001). More specifically, contractual interpretation is a matter of law. See Hamblen County v. City of Morristown, 656 S.W.2d 331, 335-336 (Tenn. 1983).

### Scope of Certified Question
When appropriate, we are empowered to "exercise our discretion to reframe the Rule 23 certified question before us so as to provide the guidance actually sought." Shorts v. Bartholomew, 278 S.W.3d 268, 280 n.13 (Tenn. 2009) (citing 17A Charles Alan Wright, et al., Federal Practice and Procedure, Jurisdiction 3d § 4248 n. 67 and accompanying text (Westlaw 2009)). It may, at times, be necessary to slightly expand or restrict the scope of the question posed to the Court in order to

further the interests of judicial efficiency, comity, and federalism that underlie our inherent judicial power to answer certified questions. See Haley v. Univ. of Tenn.-Knoxville, 188 S.W.3d 518, 523 (Tenn. 2006).

The district court asked "[w]hether a municipal utility board has the authority to enter into a contract with an appointed city official who serves at the will and pleasure of the Board of Mayor and Aldermen whereby the utility board contracts to continue to pay the official's salary for a multi-year time period [8 and 14 years] after the official's employment is terminated." Read literally, this question requests a ruling applicable to all municipal utility boards. According to the United States Census Bureau's 1997 census of governments, however, 343 municipal governments operate within the State of Tennessee. Census Bureau, U.S. Dep't of Commerce, 1997 Census of Governments – Volume 1, Government Organization, app. A at A-236 (1997), available at http://www.census.gov/prod/gc97/gc971-1.pdf. All are different. Further, as this case illustrates, the phrase "utility board" may refer to a variety of entities providing different services under different legal constraints. See Black's Law Dictionary 1582 (8th ed. 2004) (defining "public utility").

In an effort to avoid the "limitless field of advisory opinions," State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 193 (Tenn. 2000) (quoting Story v. Walker, 404 S.W.2d 803, 804 (1966)), we have reframed the certified question as follows: Whether the Boards of the Ripley Gas and Electric Departments had the authority to enter into contracts with a superintendent who served at the will and pleasure of the Board of Mayor and Aldermen, whereby the superintendent was entitled to salary and benefits for multi-year periods of time [8 and 14 years] after the employment was terminated. For the reasons below, we conclude that neither the Gas nor the Electric Board had such authority and any provisions establishing an entitlement to salary and benefits for terms of years were beyond the powers of the respective departments.

### Dillon's Rule and Long-Term Employment Contracts

"Fundamental in [Tennessee] law is that municipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their charters or under statutes." City of Lebanon v. Baird, 756 S.W.2d 236, 241 (Tenn. 1988). "The provisions of the charter are mandatory, and must be obeyed by the city and its agents . . . ." Barnes v. Ingram, 397 S.W.2d 821, 825 (Tenn. 1965) (quoting Marshall & Bruce Co. v. City of Nashville, 71 S.W. 815, 819 (Tenn. 1903)); see also Faust v. Metro. Gov't of Nashville & Davidson County, 206 S.W.3d 475, 485 (Tenn. Ct. App. 2006) (holding a reclassification of civilian employees to be outside the authority provided by the Metropolitan Code). The rationale for these principles is well-settled in the law:

> "Municipal corporations represent the public, and are themselves to be protected against the unauthorized acts of their officers, when it can be done without injury to third parties. . . . The protection of public corporations from such unauthorized acts of their officers is a matter of public policy, in which the whole community is concerned." . . . That a municipal corporation cannot and should not be bound by an ultra vires contract is a proposition that is well settled by authority, and sustained by

reason and justice. To hold otherwise would be to vastly enlarge the authority of public agents, and permit them to bind a municipal corporation by contracts absolutely prohibited by law, and would thus expose the public to evils and abuses that the limitations and restrictions thrown around corporate officers are intended to prevent.

City of Nashville v. Sutherland, 21 S.W. 674, 676-77 (Tenn. 1893) (quoting oral argument).

In consequence, "[w]hen a municipality fails to act within its charter or under applicable statutory authority, the action is *ultra vires* and void or voidable." Baird, 756 S.W.2d at 241 (citing Crocker v. Town of Manchester, 156 S.W.2d 383, 384 (Tenn. 1941)); see also Marshall & Bruce Co., 71 S.W. at 818-19.[4] In summary, under Tennessee law a municipal action may be declared ultra vires "(1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute." Baird, 756 S.W.2d at 241.

In the recent case of Arnwine v. Union County Board of Education, 120 S.W.3d 804 (Tenn. 2003), we set aside a four-year contract for an assistant superintendent of schools (or a teacher) because the length of the term, absent specific statutory authority, was beyond the power of the school board.[5] The assistant superintendent argued that the board of education was permitted to enter into such a contract pursuant to Tennessee Code Annotated section 7-51-903, which provides, in relevant part, that

[e]xcept as otherwise authorized or provided by law, municipalities are . . . authorized to enter into long-term contracts for such period or duration as the municipality may determine for any purpose for which short-term contracts not

---

[4] An act is ultra vires when it is "beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary 1559 (8th ed. 2004); see Smith v. Nelson, 18 Vt. 511 (1846) ("In the case of the Presbytery of Auchterarder, which came before the Lords of the Sessions, and, on appeal, to the House of Lords, in 1839, the act of the presbytery, in rejecting a person presented to them to be ordained, in pursuance of what was termed the *veto act* of the General Assembly, was declared to be *ultra vires* and consequently void." (emphasis added)). Although the ultra vires doctrine is often discussed in the context of private corporations, see, e.g., Kent Greenfield, Ultra Vires Lives! A Stakeholder Analysis of Corporate Illegality (with Notes on How Corporate Law Could Reinforce International Law Norms), 87 Va. L. Rev. 1279, 1302-04 (2001), the doctrine applies to municipal corporations as well. See 56 Am. Jur. 2d Municipal Corporations, Counties, and Other Political Subdivisions § 454 (2000 & Westlaw 2008). Paul Craig, a legal scholar from the United Kingdom, described the ultra vires doctrine, as it applies to government entities, as follows: "Parliament has found it necessary to accord power to ministers, administrative agencies, local authorities and the like. Such power will always be subject to certain conditions contained in the enabling legislation. The courts' function is to police the boundaries stipulated by Parliament." Paul Craig, Ultra Vires and the Foundations of Judicial Review, 57 Cambridge L.J. 63, 64-65 (1998).

[5] The school board may enter into a four-year contract with the director (superintendent) of schools. Tenn. Code Ann. § 49-2-203(a)(14)(A) (2002 & Supp. 2008). Similarly, a school principal may enter into a multi-year contract so long as it does not exceed the contract term of the current superintendent. Tenn. Code Ann. § 49-2-303(a)(1) (2002 & Supp. 2008).

extending beyond the term of the members of the governing body could be entered
. . . .

Tenn. Code Ann. § 7-51-903 (2005). We concluded, however, that section 7-51-903 did not apply because "there are specific statutes referring to personnel and employment contracts in education" and those with more specificity prevail over the general rule of section 7-51-903. Arnwine, 120 S.W.3d at 809. Because Arnwine's contract was governed by specific statutory provisions governing teachers rather than by the general terms of section 7-51-903, we considered whether those more specific statutes permitted a multi-year contract in the context of "Dillon's Rule,"[6] which requires a "strict and narrow construction of local governmental authority" and allows a municipality to act only when

> (1) the power is granted in the "express words" of the statute, private act, or charter creating the municipal corporation; (2) the power is "necessarily or fairly implied in, or incident to[,] the powers expressly granted"; or (3) the power is one that is neither expressly granted nor fairly implied from the express grants of power, but is otherwise implied as "essential to the declared objects and purposes of the corporation."

Id. at 807-08 (quoting S. Constructors, 58 S.W.3d at 710-11). After confirming Dillon's Rule as a fundamental canon of construction, this Court emphasized that "[a]ny fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation and the power is denied." Id. at 808 (quoting Mayor of Nashville v. Linck, 80 Tenn. 499, 504 (1883) (quoting 1 John F. Dillon, Commentaries on the Law of Municipal Corporation 173 1st ed. 1872)). Our conclusion was that the relevant statutes confirmed that there was no authority for a multi-year contract for an assistant superintendent of schools. Id. at 807-09.

As in Arnwine, whether a multi-year employment contract would be permissible in this case depends upon the level of authority granted under law. In our view, neither the City Charter nor the relevant statutes empower the Electric Department or the Gas Department to enter an agreement containing the terms at issue.

I. The City Charter

Initially, the City Charter required that the superintendent serve at the "will and pleasure" of the Board of Mayor and Alderman. A "pleasure appointment" is "[t]he assignment of someone to employment that can be taken away at any time, with no requirement for notice or a hearing." Black's Law Dictionary 1192 (8th ed. 2004).

---

[6] John Forrest Dillon served as Judge of Iowa's Seventh Judicial Circuit from 1858 to 1862. For eight years thereafter he served on the Iowa Supreme Court before being appointed by President Grant to what eventually became the Eighth Circuit of the United States Court of Appeals. See Clinton v. Cedar Rapids & the Missouri River R.R., 24 Iowa 455 (1868); see also Hunter v. City of Pittsburgh, 207 U.S. 161, 179-80 (1907); Merrill v. Town of Montecello, 138 U.S. 673, 681 (1891). But see Berent v. City of Iowa City, 738 N.W.2d 193, 196-97 (Iowa 2007) (explaining that a later Iowa constitutional amendment "reversed the Dillon Rule").

II.     The Municipal Electric Plant Law

Allmand argues that the Electric Department employment contract with Allmand and the post-termination compensation provision and, by extension, the contract approved by the Gas Department Board, were authorized under the Municipal Electric Plant Law of 1935. He cites Tennessee Code Annotated section 7-52-103(a), which empowers every municipality to

(1) Acquire, improve, operate and maintain within or without the corporate or county limits of such municipality, and within the corporate or county limits of any other municipality, with the consent of such other municipality, an electric plant and to provide electric service to any person, firm, public or private corporation, or to any other user or consumer of electric power and energy, and charge for the electric service;

. . . .

(7) Make contracts and execute instruments containing such covenants, terms and conditions as in the discretion of the municipality may be necessary, proper or advisable for the purpose of obtaining loans from any source, or grants, loans or other financial assistance from any federal agency; make all other contracts and execute all other instruments as in the discretion of the municipality may be necessary, proper or advisable in or for the furtherance of the acquisition, improvement, operation and maintenance of any electric plant and the furnishing of electric service; and carry out and perform the covenants and terms and conditions of all such contracts and instruments;

. . . .

(9) Do all acts and things necessary or convenient to carry out the powers expressly given in this part.

Tenn. Code Ann. § 7-52-103(a); see also Tenn. Code Ann. § 7-52-107 (giving municipality authority to create board of public utilities). Allmand also relies upon Tennessee Code Annotated section 7-52-134, which permits municipal authorities to "do all things necessary or convenient to carry out the purposes of this part in addition to the powers expressly conferred in this part" and which requires that the powers granted by the Municipal Electric Plant Law be "liberally construed to effectuate the purposes of this part." Tenn. Code Ann. § 7-52-134.

The statutes cited by Allmand, however, must be read in conjunction with Tennessee Code Annotated section 7-52-114(b), which specifically states as follows:

The supervisory body shall appoint an electric plant superintendent . . . who shall be qualified by training and experience for the general superintendence of the acquisition, improvement and operation of the electric plant. The superintendent

-10-

need not be a resident of the state at the time of appointment. The superintendent's salary shall be fixed by the person or agency appointing such superintendent. *The superintendent shall serve at the pleasure of the supervisory body and may be removed by such body at any time.*

Tenn. Code Ann. § 7-52-114(b) (emphasis added). This specific provision controls over the more general ones cited by Allmand. Moreover, this provision is almost identical to the restrictions in the City's Charter, which likewise prevails over the general statutory provisions relied upon by Allmand. See Grubb v. Mayor of Morristown, 203 S.W.2d 593, 596 (Tenn. 1947) (holding that a general law will not repeal particular provisions of a city charter unless clearly intended). Thus, the statutes cited by Allmand are not dispositive of the certified question posed to this Court.

      III.     Sewer, Gas, and Waterworks Statutory Provisions

Lastly, Allmand argues that the employment contracts with the post-termination compensation provisions were authorized under various statutes governing Gas, Sewers and Waterworks. For example, he cites the provisions of Tennessee Code Annotated section 7-35-406(a):

> Every incorporated city and town in this state acquiring a waterworks or sewerage system under the provisions of this part shall be required and is hereby authorized and empowered to appoint a board of waterworks and/or sewerage commissioners to have supervision and control of construction and operation of such works. "Board," as used in this part, means a board of waterworks and/or sewerage commissions as required and authorized in this section, constituted and appointed as provided in §§ 7-35-407 – 7-35-409. The governing body of any incorporated city or town may, by proper ordinance, elect to perform the duties required of the boards under this part, in which event the governing body shall have all the powers, duties and responsibilities imposed upon the board, and all references to the board shall refer to such governing body acting in the capacity of such board.

Tenn. Code Ann. § 7-35-406(a); see also Tenn. Code Ann. § 7-35-406(b) ("Municipalities . . . owning or operating a gas system shall have the power and are hereby authorized to transfer to and confer upon the board of waterworks and sewerage commissioners the jurisdiction over such gas system."). Allmand also points to Tennessee Code Annotated section 7-35-412, which provides, in part, as follows:

> The board of waterworks or sewerage commissioners . . . has the power to take all steps and proceedings and to make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this part, *subject only to limitations on matters requiring approval by the governing body of the city or town in question. . . .* After completion and acceptance of the works by the board, and approval of such acceptance by the governing body of the city or town, the board shall have the power, and it shall be its

-11-

duty, to proceed with all matters and perform everything necessary to the proper operation of the works and collection of charges for service rendered, subject only to the limitation of funds available for operation and maintenance. To this end, the board may employ such employees as in its judgment may be necessary and may fix their compensation, all of whom shall do such work as the board shall direct.

Tenn. Code Ann. § 7-35-412 (emphasis added).

Again, these general statutory provisions must be read in conjunction with the City Charter and the prohibition against actions beyond the powers conferred by the City Charter. See Grubb, 203 S.W.2d at 596. The statutes cited by Allmand do not negate the requirement that he serve at the will and pleasure of the board.

### Post-Termination Compensation

Allmand further argues that the post-termination compensation described in the contracts were mere severance payments that would not have conflicted with the at-will nature of his employment. Cf. Myers v. Town of Plymouth, 522 S.E.2d 122, 124 (N.C. Ct. App. 1999) (holding that lump-sum severance provision did not violate requirement that town employer manager serve "at its pleasure"). Regardless of whether some form of severance compensation would have been permissible, the specific provisions at issue not only are inconsistent with the at-will nature of the employment, but also do not authorize an award of severance.

By the terms in each of the two contracts, Allmand would have been entitled to continuing pay and benefits upon termination for any reason other than "voluntarily abandon[ing] his job or engag[ing] in intentional conduct that operated to the specific detriment of the [City's] welfare." If those provisions are enforceable, the Electric and Gas Departments will undergo the full cost of a superintendent but receive no benefit from Allmand's services for a period of years. Such an onerous requirement would have the practical effect of establishing precisely the type of long-term obligation that the City's charter forbids. See Haynes v. City of Pigeon Forge, 883 S.W.2d 619, 622 (Tenn. Ct. App. 1994). One cannot do indirectly what is prohibited directly.

However onerous the obligation may be, we emphasize that our response to the question of law does not rest on that fact alone. Instead, we further conclude that the provisions obligating the Departments to continue to pay salary years after the termination of employment have few of the characteristics associated with a traditional severance package, and that the contracts, read as a whole, do not suggest that the parties intended them as such.

A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties. Allstate Ins. Co. v. Watson, 195 S.W.3d 609, 611 (Tenn. 2006) (citing Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005)); see also U.S. Bank N.A. v. Tenn. Farmers Mut. Ins. Co., 277 S.W.3d 381, 386-86 (Tenn. 2009) (citing Christenberry, 160 S.W.3d at 494). Courts must look at the plain meaning of the words in a contract to determine the parties' intent. Watson, 195 S.W.3d at 611. If the contractual language is clear and unambiguous, the literal meaning controls;

however, if the words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. Id. In such circumstances, "the court must apply established rules of construction to determine the intent of the parties." Id. (citing Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 890 (Tenn. 2002)).

This Court's decision in Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999), illustrates these key principles in determining whether a contract provides for severance pay or for liquidated damages. In Guiliano, the employee entered into a three-year employment contract with his employer. Paragraph 9 provided that if the employer terminated the contract without cause, the employee "shall continue to receive [his] then current salary from the date of termination through [the contract expiration date]." Id. at 92-93. Although the trial court awarded a judgment based on breach of contract for the balance due for the term, the Court of Appeals classified the provision as one for liquidated damages and concluded that the damage award qualified as an unlawful penalty.[7] On appeal to the Court, the employee argued that he was terminated without cause before the contract expired and that he was entitled to "severance pay," if not liquidated damages, pursuant to the language in paragraph 9. Id. at 94. After granting further review, this Court began its analysis by describing severance pay as

> a form of compensation paid by an employer to an employee at a time when the employment relationship is terminated through no fault of the employee. *Black's Law Dictionary* 1374 (6th ed. 1990). The reason for severance pay is to offset the employee's monetary losses attributable to the dismissal from employment and to recompense the employee for any period of time when he or she is out of work. . . . The amount of payment is generally based upon the types of services and the number of service years performed by the employee on behalf of the employer.

Id. at 97 (footnote and case citations omitted). We emphasized that severance, unlike liquidated damages, is not conditioned upon a breach of contract or a reasonable estimation of damages in consequence thereof, but is instead an absolute entitlement to recovery regardless of any breach. Id. Applying these principles, we stated as follows:

> Paragraph 9 provides that if [the employer] terminates the contract and [the employee's] employment without cause, the [employee] shall continue to receive his then current salary from the date of termination until October 31, 1995, the contract expiration date. Paragraph 9 does not state that sums payable are based upon an

_____

[7] After adopting the "prospective approach" as to liquidated damages – that is, a determination based upon the circumstances existing at the time of the contract – this Court observed that any award is an unenforceable penalty as against public policy if "the provision and circumstances indicate that the parties intended merely to penalize for a breach . . . ." Guiliano, 995 S.W.2d at 100-01. A penalty is "a sum inserted in a contract, not as a measure of compensation for breach, but rather a punishment for default, or by way of security for actual damages which may be sustained by reason of nonperformance, and it involves the idea of punishment." Id. at 98 n. 9 (quoting 22 Am. Jur. 2d Damages § 684 (1988)).

estimation of damages in the event of a breach of contract. However, *it is clear that the provision affords the [employee] a set amount of compensation in the event that [the employer] terminates the agreement and [employee's] employment, without cause, before the end of the contract*. Relying on the plain meaning of the language in Paragraph 9, we conclude that recovery therein is conditioned upon [the employer's] breach of contract.

Id. at 97 (emphasis added). As a result, the Court held that the provision was "one for liquidated damages and not severance pay." Id. at 97-98.

Here, the only reference to the term "severance payment" is in paragraph 12 of the Gas Department contract – "above-noted severance payments." The Electric Department contract does not include the term at all. The payments are predicated upon Allmand's termination before the expiration of the eight- and fourteen-year terms set forth in the agreements, i.e., a breach of the contract. Conversely, the contracts contain no reference to the nature of Allmand's services, the length of his tenure to the City, or any other characteristics that might warrant the classification of the post-termination compensation as severance pay. See id. at 97-98.

Labeling the post-termination recompense as a "severance payment" in one of the two contracts is not determinative of the parties' intent. Id. at 98. Instead, "[t]he better rule in all cases is to read the whole instrument and give effect to every part if possible, and thereby reach its true meaning, and not resort to artificial or arbitrary rules until the former rule is exhausted." Stratton v. Thompson, 78 Tenn. 229, 238 (1882). In each of the two contracts, the provisions governing pay speak in terms of the entitlement to "annual salary, compensation and all benefits" and require the compensation to be payable pursuant to the "normal bi-weekly schedule." Because "provisions in [a] contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract," Guiliano, 995 S.W.2d at 95 (citing Rainey v. Stansell, 836 S.W.2d 117, 118-19 (Tenn. Ct. App. 1992)), it is our view that the terms of the two contracts directing post-termination compensation do not describe "severance payments" in any traditional sense.

Although severance provisions are common and may be viewed favorably as a matter of policy, our established precedent mandates that the intent of the parties controls. Here, the parties crafted employment agreements in which the post-termination payment provisions were dependent on a breach of the purported employment terms of eight and fourteen years. The practical effect of the provisions would have granted liquidated damages to Allmand for the breach of the very terms that the Departments had no authority to approve.

Moreover, it is immaterial whether the City was operating in its "governmental" or "proprietary" capacity when making the contracts, as further argued by Allmand. He insists that the employment agreements and the post-termination payments were authorized under the principle that "a municipality operat[ing] a utility, . . . operates it in a proprietary capacity and is held to the same standard as a private corporation." Maury County Bd. of Pub. Utils. v. City of Columbia, 854

S.W.2d 890, 892 (Tenn. Ct. App. 1993). As the Defendants correctly observe, however, classifying a municipal utility as a proprietary function is of limited significance:

> [I]t should be pointed out that our decision is not based on any distinction between "governmental" and "proprietary" functions, as mentioned in Cox[v. Green County, 175 S.W.2d 150 (Tenn. Ct. App. 1943)]. As this Court noted in State ex rel. Association for the Preservation of Tennessee Antiquities v. City of Jackson, 573 S.W.2d 750, 754 (Tenn. 1978), "we do not find the dichotomy of 'governmental' and 'proprietary' functions to be particularly helpful from a standpoint of legal analysis. . . ." Attempts to distinguish contracts entered into in "governmental" as opposed to "proprietary" capacities contributes only ambiguity and confusion. Courts have been altogether unsuccessful in defining the scope of "governmental" functions. See Garcia v. San Antonio Metro Transit Authority, 469 U.S. 528, 105 S. Ct. 1005, 83 L.Ed.2d 1016 (1985).

Washington County Bd. of Educ. v. MarketAmerica, Inc., 693 S.W.2d 344, 348-49 (Tenn. 1985). The broad argument advanced by Allmand does not salvage the claim.

## Conclusion

Neither the Ripley Electric nor the Ripley Gas Department Boards had the authority to enter into an employment agreement with a superintendent providing for multi-year post-termination compensation.[8] Their actions were ultra vires under Tennessee law. The provisions authorizing future salary and benefits cannot be classified as a permissible form of severance pay.

_____
GARY R. WADE, JUSTICE

---

[8] Our resolution of this certified question does not preclude the possibility that a local government may, in some cases, be authorized to enter into an agreement obligating it to provide severance pay. Cf. Thompson v. Memphis Light, Gas and Water Div., 244 S.W.3d 815, 822 (Tenn. Ct. App. 2007) (holding "that a genuine issue of material fact exists regarding whether the . . . [utility board] exceeded its authority when it included the provision for enhanced severance benefits"); Walker v. City of Cookeville, No. M2002-01441-COA-R3-CV, 2003 WL 21918625, at *9 (Tenn. Ct. App. Aug. 12, 2003) (holding that city-run hospital breached employment contract by failing to make severance payments).