# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 31, 2010 Session

## WILLIAM (BOB) SIMERLY, ET AL. v. CITY OF ELIZABETHTON

### Appeal from the Chancery Court for Carter County
### No. 26425    G. Richard Johnson, Chancellor

---

### No. E2009-01694-COA-R3-CV - FILED JANUARY 5,  2011

---

William (Bob) Simerly and Lewis Honeycutt (collectively "the Retirees"), along with numerous other former employees of the Elizabethton Electric System ("the EES") brought this civil action against the City of Elizabethton ("the City") to recover the value of certain EES benefits claimed to be owed them and wrongfully withheld by the City.  After the City agreed to reduce its claims and counterclaims along with all the former employees taking voluntary dismissals, with the exception of Mr. Simerly and Mr. Honeycutt, both parties jointly filed a motion for partial summary judgment whereby the trial court was asked to rule on the legal validity of the underlying contracts upon stipulation by the parties of a number of exhibits and facts.  The trial court granted the Retirees  partial summary judgment, finding the underlying contracts to be legally valid, and the benefits promised thereunder to still be in force.  The trial court's partial judgment reserved the issue of the amount of the Retirees' damages for a later hearing.  The City then filed a notice of appeal from the trial court's ruling before the hearing on the damages could be scheduled.  The Retirees moved in this court to dismiss the appeal on the basis of lack of finality of the trial court's partial judgment. We denied the Retirees' motion without prejudice.  We reverse the ruling of the trial court on the partial summary judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Charlton R. Devault, Jr., Kingsport, Tennessee, for the appellant, City of Elizabethton.

Dan D. Rhea, Knoxville, Tennessee, for the appellees, William (Bob) Simerly and Lewis

Honeycutt.

## OPINION

## I. BACKGROUND

In 1945, the City established the EES pursuant to the provisions of the Tennessee Municipal Electric Plant Law of 1935 ("the Electric Plant Law"), Tenn. Code Ann. § 7-52-101, et.seq. The EES sells TVA-generated electrical power to residents of the City and Carter County.

The Electric Plant Law grants municipalities and their appointed power boards "liberal" powers. Tenn. Code Ann. § 7-52-134(b). The statute provides:

> This part is remedial in nature and the powers hereby granted shall be liberally construed to effectuate the purpose of this part, and, to this end, every municipality shall have *power to do all things necessary or convenient* to carry out the purpose of this part *in addition to the powers expressly conferred* in this part.

*Id.* (emphasis added). The Electric Plant Law notes that "all powers to acquire, improve, operate and maintain, and to furnish electric service, and all powers necessary or convenient to furnishing electric service, conferred by this part shall be exercised on behalf of the municipality by the supervisory body and the superintendent, respectively." Tenn. Code Ann. § 7-52-114(c).

Pursuant to the provisions of the Electric Plant Law, the City set up a separate governing board ("the EES Board") to manage and operate the EES. Tenn. Code Ann. § 7-52-114. The record reveals that between 1945 and 2005, the EES Board set wage rates and provided fringe benefits for EES employees based on a series of collective bargaining agreements negotiated with the employees' union, the International Brotherhood of Electrical Workers ("IBEW"). The EES Board specifically approved each of these agreements at regularly conducted public meetings.[1] Each consecutive agreement was designated to be the EES "Labor Code."

---

[1] The EES Board was composed of City residents and ratepayers to exercise general supervision and control over the operation of the EES. The Board, from time to time, appointed successive "superintendents," each of whom has been known as general managers to manage the daily operations of the system.

In enacting the Labor Codes, the EES Board specifically determined that

> it is of great importance that the relations between said System and its employees, be satisfactory both to the System, its patrons, and said employees, and the wages, working conditions, etc., be fair and equitable both to the system and to the Employees, not subject to caprice of either the Employees or the Management, and that *such situation can best be obtained by definite rules and regulations enacted and promulgated by this board*;

> 1. **Employee Representation**

> These regulations are enacted as a result of negotiations with the employees classified herein and affected hereby, all of whom are now members of and have at their request been represented in these negotiations by the International Brotherhood of Electrical Workers, Local Union 934, and this Agreement is signed for and in behalf of such employees by their said duly authorized representatives as evidence of their acquiescence herein and their intention to cooperate with the System in the performance hereof.

> * * *

(Emphasis added). It is the position of the Retirees that the EES Labor Codes were determined by the EES Board and the superintendents, on behalf of the City, to be "necessary" and/or "convenient" to the operation of the EES.

Mr. Simerly worked for the EES as a unionized employee for 31 years. Upon his retirement in 1998, the applicable Labor Code provided employees taking retirement that they would continue to receive EES health insurance coverage at no cost to them for the rest of their lives. Mr. Honeycutt served the EES as a unionized employee for 37 years. Upon his early retirement in 2003, the applicable Labor Code promised employees who took early retirement that they and their spouses would continue to receive EES health insurance coverage, for a small premium, during their "early retirement" period (i.e. until the retiree reached age 65).[2]

In 2005, an audit of the EES was conducted by the Tennessee Comptroller of the Treasury. Several EES activities and practices were criticized. In one particular finding, the Comptroller determined that the EES Board did not have authority under Tennessee law to negotiate collective bargaining agreements with the IBEW. The Comptroller based his

---

[2]By 2003, the guarantee of lifetime medical insurance coverage had been discontinued.

-3-

determination upon this court's opinions in *Weakley County Mun. Elec. Sys. v. Vick*, 309 S.W.2d 792 (Tenn. Ct. App. 1957), and *Local Union 760 v. City of Harriman*, No. E2000-00367-COA-R3-CV, 2000 WL 1801856 (Tenn. Ct. App. E.S., Dec. 8, 2001), and added his own comment that "municipal electric systems could not lawfully enter contracts with labor unions." The Comptroller recommended that the EES Board consult with counsel because, in his view, the current EES Labor Code appeared to be "null and void." The EES Board responded to the report with a statement that the current collective bargaining agreement expired on June 30, 2005, and that it did not intend to enter into a new agreement.

Acting upon that pronouncement and other recommendations from the Comptroller, the City Council eliminated the EES Board, and assumed direct control over EES operations. Subsequently, City administrators ordered the curtailment of insurance benefits still being extended to EES retirees under past Labor Codes. Beginning on August 1, 2005, the City ceased full payment and funding of the entire amount of insurance benefits. The EES retirees were furnished the same insurance benefits afforded to all other City employees.

In December 2005, numerous former employees of the EES sued to recover the value of their benefits they felt the City was wrongfully withholding from them. The City responded that the contracts under which the EES benefits had been established were "illegal," and sought in a counterclaim the restitution of benefits that had already been paid pursuant to the contracts.

In September 2008, the trial court entered an order establishing Mr. Simerly and Mr. Honeycutt as the representatives of the former employees. Twelve former employees took voluntary dismissals. The quo warranto claims and constitutional violation claims of all the former employees were dismissed without prejudice. The issues retained were the breach of contract claims for withheld benefits, the illegal contract contention, and the counterclaims by the City against the two Retirees.

In June 2009, the trial court heard oral argument on the parties' joint motion for partial summary judgment. At that time, the Retirees dropped the claim made in their original complaint that the promised Labor Code benefits became vested and nonforfeitable upon their retirement. The Retirees conceded that under the Electric Plant Law, the governing legislative body retained the power to rescind benefits promised to employees at anytime.[3]

---

[3]The Tennessee Supreme Court discussed the differences between pension retirement plans and health insurance welfare benefit plans in *Davis v. Wilson County*, 70 S.W.3d 724 (Tenn. 2002). Relying upon our opinion in *Hamilton v. Gibson County Util. Dist.*, 845 S.W.2d 218 (Tenn. Ct. App. 1992), the Court noted that

(continued...)

However, the Retirees argued the following to the trial court:

> MR. RHEA: . . . [O]ur argument . . . is that the City just hasn't passed an ordinance rescinding these labor codes. They're still active if they accrued. The City has never rescinded them. What the City has done is they've assumed that they've never existed and that's just the wrong assumption.
>
> * * *
>
> . . . [W]hat I'm saying, is that the City has not done it. They haven't repealed, they haven't rescinded these accrued promises to Mr. Simerly and Mr. Honeycutt. What they did is they took the State Controller's legal advice at its word saying "well, there never was a Labor Code because they were null and void from the very beginning." And they put that in their ordinance saying because the Elizabethton Electric System has never had labor policies, . . .

---

[3](...continued)
[i]nsurance coverage provided to employees under a group health insurance plan are classified as "welfare benefit" plans as opposed to pension benefit plans, whereby retirement income is provided for employees. The law is clear that there is no legal requirement on the part of a governmental entity to provide a welfare benefit plan to its employees and if it chooses to do so, the plan may be modified or terminated at any time. *Id.* at 223 (citing *State ex rel. Thompson v. City of Memphis*, 147 Tenn. 658, 251 S.W.46 (1923)).

In our view, the reasoning in *Hamilton*, which represents the majority view, is persuasive and full applicable to the present case for several reasons. First, in arriving at its holding, the appellate court in *Hamilton* relied upon analogous cases under the Employee Retirement Income Security Act (ERISA), which recognize that pension or retirement benefits vest automatically while welfare benefits, such as health care coverage, do not. *Hamilton*, 845 S.W.2d at 223; *see also Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855 (4th Cir. 1994). As a result, the Court of Appeals correctly determined that welfare benefits may be modified or terminated at any time unless the employee meets the burden of establishing that the employer expressly provided that the benefits were intended to vest or were not to be terminated. *Hamilton*, 845 S.W.2d at 224; *see Gable*, 35 F.3d at 854-855. As the Sixth Circuit Court of Appeals has said, "vested benefits are forever unalterable, and because employers are not legally required to vest them, . . . 'the intent to vest [welfare benefits] "must be . . . stated in clear and express language.""" *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 667 (6th Cir. 1998) (alteration in original) (citation omitted); *see also Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 135 (2d Cir. 1999) ("We will not infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation."); *Gable*, 35 F.3d at 855 (requiring "clear and express language" of intent to vest welfare benefits).

*Davis,* 70 S.W.3d at 727.

-5-

what we're going to do is we're going to put the electric system under the City general personnel policy and that's fine . . . .

* * *

MR. RHEA:  There's nothing in the personnel policy, the current personnel policy that says you can't continue to pay Mr. Simerly's health insurance, or Mr. Honeycutt's wife's health insurance.  It's not been rescinded by legislative action.

After considering the facts of this court's *Weakley County* and *Local Union 760* opinions, and the statutory powers granted to municipal electric power boards by the Electric Plant Law, the trial court ruled from the bench that the Electric Plant Law did authorize the EES Board the authority to negotiate with the employee union on employee wages and benefits.  The trial court further concluded that while the City Council retained the power to abolish the appointed EES Board and to rescind promised benefits, the City had not yet done so with respect to the benefits granted by the past Labor Codes and that "the contract" was "still in existence."  Observing the parties' previous procedural agreements, the trial court held the issue of the Retirees' entitlement to damages for breach of contract in abeyance for a later hearing.

On July 9, 2009, before the trial court's bench ruling was reduced to writing and entered in the court file, the City Council did two things.  First, the City Council voted to "ratify" the past administrative action of City officials curtailing the Labor Code benefits.  Second, the City Council voted to "abolish" the Labor Codes themselves.  In pertinent part, the Resolution of the City Council provided as follows:

> WHEREAS, the former EES Board made it a practice to routinely negotiate the terms and conditions of employment for skilled electrical employees with the International Brotherhood of Electrical Workers Local Union No. 934 and signed collective bargaining agreements with the IBEW as the exclusive representative of EES skilled electrical employees; and,
>
> WHEREAS, the series of collective bargaining agreements negotiated between the EES Board and the IBEW were known as Labor Codes and expressly purported to have limited durations of one year, two years, or three years; and,
>
> WHEREAS, these successive negotiated Labor Codes provided for electric system employee benefits such as accumulated sick leave lump sum pay-outs,

-6-

health insurance benefits, life insurance benefits, and retiree health insurance benefits made modifications and alterations in the benefits from time to time; and,

WHEREAS, the EES Board, after the negotiation and approval of each Labor Code, routinely extended the same employee benefits to the "non-union" or "inside" employees of the municipal electric system; and

WHEREAS, the City Council of the City of Elizabethton did not approve or ratify any of the employee benefits provided by the EES Board to municipal electric system employees under these Labor Codes and accompanying resolutions; and

WHEREAS, financial issues and the impending inability of the E[E]S to fund the extravagant benefits it had negotiated in the Labor Codes required that the City of Elizabethton abolish the appointed EES Board and assume sole operational and financial control of the municipal electric system in May 2005 by Ordinance No. 41-6; and,

WHEREAS, the City of Elizabethton then extended and applied all the terms of the City's official 2004 Personnel Rules and Regulations, which included existing employee benefits plans and programs as required by law, to all the current and retired employees of the electric system in July 2005 by Ordinance No. 41-13; and

WHEREAS, legal disputes have arisen regarding the various employee benefits which were being furnished to the electrical system employees and funded by the system's customers and rate payers under the successive Labor Codes and accompanying resolutions; and,

WHEREAS, the City of Elizabethton has taken the position that all of the Labor Codes negotiated by the appointed EES Board and related resolutions described above were unauthorized by law, exceeded the authority of the EES Board, were against the public policy of the State of Tennessee, and were each illegal, *ultra vires*, and null and void; and,

WHEREAS, the last negotiated Labor Code between the EES Board and IBEW Local #934 which purported to provide employment benefits to electrical system employees expired by its own terms on June 30, 2005 and was not renewed or extended; and,

WHEREAS, the City's continuing to fund the extravagant benefit plans and programs which were negotiated and described in the various Labor Codes would have rendered the municipal electric system insolvent and would have required the imposition of prohibitively high electrical power rates to the customers of the municipal electric system; and,

WHEREAS, the City of Elizabethton is confirming in this resolution that it has abolished and does abolish, that it has terminated and does terminate, and that it has canceled and does cancel all employee welfare benefit plans, accumulated sick leave lump sum pay-out programs, life-time retiree insurance benefit plans or programs, and other miscellaneous employee benefit plans or programs which were described in the various negotiated Labor Codes described above;

BE IT THEREFORE RESOLVED BY THE CITY COUNCIL OF THE CITY OF ELIZABETHTON:

1. All prior actions taken by City Administrators pursuant to City ordinances to extend and apply the City's authorized employee welfare benefits, including current health insurance benefits and current retiree health insurance benefits, to municipal electric system employees are ratified and confirmed.

2. All prior actions taken by City Administrators to abolish, eliminate, terminate, and cancel employee benefits and benefit programs enjoyed only by electrical system employees under the various Labor Codes which did not comply with the City's official Personnel Rules and Regulations, and the City Code provisions, and ordinances pertinent thereto, are ratified and confirmed.

3. So that there may be no doubt regarding the impact of the official action taken earlier by the City to terminate[ ] all Labor Codes and the special terms and conditions of EES employment and employee benefits plans and programs contained therein in related resolutions, including but not limited to employee health insurance, retiree health insurance, life insurance, and accumulated sick leave lump sum pay, all the employee welfare benefits purportedly conferred by the Labor Codes to EES employees are expressly abolished, canceled, rescinded, repealed and/or terminated.

4. All employee welfare plan benefits, including all types of insurance coverages, purportedly afforded to EES employees under prior Labor Codes and related EES resolutions are terminated, rescinded, repealed, canceled, and

abolished.

. . . This Resolution does not affect the arrangements which the City has made regarding the retirement pensions of current electrical system employees or of former electrical system employees who have retired.

\* \* \*

On July 23, 2009, the trial court formally entered the "partial judgment" adopting its oral ruling from a month earlier. The partial judgment held all issues of the Retirees' remedies in abeyance for a later hearing to be scheduled by agreement of the parties. The City approved the partial judgment for entry.

Within a month of the entry of the partial judgment, the City filed a notice of appeal. The Retirees thereupon filed a motion to dismiss the appeal in this court, which we denied, while allowing the parties to raise their respective arguments as to the correctness of the City's appeal in their briefs on the merits.

## II. ISSUES

The City raises the following issues on appeal:

1.      Whether a partial summary judgment, reserving the issue of the Retirees' remedies under that judgment for later hearing, is a "final judgment" appealable as of right under Tenn. R. App. P. 3; otherwise, does "good cause" exist under Tenn. R. App. P. 2 sufficient to suspend Tenn. R. App. P. 3's "final judgment" requirement in the discretion of the court.

2.      Whether the trial court erred as a matter of law in holding that the Labor Codes, as a collective bargaining agreement negotiated and executed between the EES's Board and the municipal employees represented an employee union, were "good and in existence" and were otherwise lawfully within the authority of governing boards of municipal electric plants under the electric plant law, so that the Retirees were entitled to health insurance benefits described by the Labor Codes claimed to be in effect when they retired.

-9-

The Retirees phrased the primary issue as whether governing boards of municipal electric plants, established under the Electric Plant Law, have authority under that law to set employee wages and benefits by means of collective bargaining agreements with an employee union.

## III.  STANDARD OF REVIEW

Tenn. R. Civ. P. 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts.  *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).

In *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), the Tennessee Supreme Court clarified the moving party's burden of proof in a summary judgment motion.  A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Id.* at 5.  According to the Court, when a party seeking summary judgment has made a properly supported motion, the burden shifts to the non-moving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.  *Id.*; *see Byrd*, 847 S.W.2d at 215; *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). The non-moving party may not simply rest upon the pleadings, but must offer proof by affidavits or other discovery materials (depositions, answers to interrogatories, and admissions on file) to show that there is a genuine issue for trial.  If the non-moving party does not so respond, then summary judgment, if appropriate, shall be entered against the non-moving party.  Tenn. R. Civ. P. 56.06.

There is no presumption of correctness for summary judgments on appeal.  *See City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). This court must view all of the evidence in the light most favorable to the non-movant and resolve all factual inferences in the non-movant's favor.  *Luther v. Compton*, 5 S.W.3d 635,639 (Tenn. 1999); *Muhlheim v. Knox County Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). When the undisputed facts, however, support only one conclusion, then the moving party is entitled to judgment as a matter of law and a summary judgment will be upheld.  *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

## IV. DISCUSSION

## A.

Our earlier denial of the Retirees' motion to dismiss the appeal requires that we first address whether we have subject matter jurisdiction to hear the present appeal. The issue was expressly preserved for subsequent briefing.

Generally, this court does not have subject matter jurisdiction over orders that are not final, unless otherwise provided by statute or the Rules of Appellate Procedure. *See Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990). Rule 3(a) of the Tennessee Rules of Appellate Procedure provides that when multiple parties or multiple claims are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable. Rule 54.02 of the Tennessee Rules of Civil Procedure provides that trial courts "upon an express determination that there is no just reason for delay" to direct the entry of a final judgment on fewer than all of the claims. *See Rector v. Halliburton*, No. M1999-02802-COA-R3-CV, 2003 WL 535924, at *2 (Tenn. Ct. App. M.S., Feb. 26, 2003).

In the instant case, the trial court issued a partial judgment in which it specifically ordered another hearing to adjudicate the Retirees' damages. There was no application for permission to appeal pursuant to the interlocutory process described in Tenn. R. App. P. 9 or 10, and the order was not certified as final under Rule 54.02 of the Tennessee Rules of Civil Procedure. Hence the partial judgment entered by the trial court must adjudicate all of the claims and the rights and liabilities of the parties in order for us to have jurisdiction to hear this appeal. *See City of Jackson v. Hersh*, No. W2008-02360-COA-R3-CV, 2009 WL 2601380, at *3 (Tenn. Ct. App. W.S., Aug. 25, 2009) (citing *Ikbariah v. Williams*, No. W2008-00126-COA-R3-CV, 2008 WL 4613952, at *1 (Tenn. Ct. App. W.S., Oct. 17, 2008)).

Our courts have generally defined a "final judgment" as one that "resolves all the issues in the case, 'leaving nothing else for the trial court to do.'" *King v. Spain*, No. M2006-02178-COA-R3-CV, 2007 WL 3202757, at *8 (Tenn. Ct. App. M.S., Oct. 31, 2007) (quoting *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003)). Less clear is the extent to which purely remedial issues, specifically undetermined amounts of recovery as in this case, may constitute an unresolved "issue" to bar our review. We have previously impliedly taken the position in dicta that yet to be ascertained amounts of recovery of damages, as the sole unresolved matter, may not prevent a party from pursuing a Tenn. R. App. P. 3 appeal. *Cf. City of Jackson,* 2009 WL 2601380, at *4 (disbursement of escrow funds, though not a litigation "claim" or liability matter, was an unresolved issue that made "final order"

appellate review unavailable).  Surmising the significance of the possibility of pre-recovery determination judgments as "final" for appeal purposes, the City has correctly distinguished our conclusion in *City of Jackson* where we dismissed the appeal for lack of jurisdiction. Unlike the trial court judgment's lack of finality in that case due to the existence of an outstanding request for attorney's fees that had not yet been addressed, here the parties stipulated all of the claims and potential liabilities of all parties as part of their motions for summary judgment that were then resolved by the partial judgment.

Thus, we find that all of the substantive claims and rights between the parties, and all the legal theories of recovery, as stipulated by the parties, were effectively addressed by the trial court and were adjudicated.  The only matter left to be determined by the trial court was any unpaid past benefits due each of the Retirees as the amount of their damages.

Even if the remaining issue of damages would result in a conclusion that all the substantive matters have not been effectively addressed, we may suspend the final judgment requirement in our discretion upon finding "good cause" to do so, pursuant to Tenn. R. App. P. 2.  *See Bayberry Assocs. v. Jones*, 783 S.W. 2d 553, 559 (Tenn. 1990).  In *Parker v. Lambert*, 206 S.W. 3d 1 (Tenn. Ct. App. 2006), we elected to suspend Rule 3(a) because "[t]he issues which have already been adjudicated by the Chancery Court are unlikely to be pretermitted by future events.  Rather than delaying the inevitable need to address these issues, judicial economy is best served by addressing the issues on their merits in this appeal." *Id.* at 4.  Similarly, this court has also articulated the ability "to consider the merits of all issues on appeal except[] the amount of the [recovery]" and unfair prejudice to the parties as appropriate Rule 2 "good cause" factors to consider.  *Rector*, 2003 WL 535924, at *3.

We find that the parties are not prejudiced by our present consideration of the merits of all the legal issues involved apart from any determination of damages.  Given the significant principles of municipal law and public policy on collective bargaining issues involved in this appeal, in the interests of judicial economy and expediting a decision on these matters, we conclude that good cause exists for us to suspend the finality provisions of Tenn. R. App. P. 3 pursuant to Rule 2 and hear this appeal.  For the foregoing reasons we do not agree with the Retirees that the current appeal was "frivolous," and therefore we decline to impose the statutory sanctions of Tenn. Code Ann. § 27-1-122.

**B.**

The City contends that the trial court erred in ruling that the Labor Codes governing the Retirees' benefits were "good and in existence" at the time of the judgment's rendering.

According to the City, none of the provisions of the Electric Plant Law authorized the EES Board or its superintendent to negotiate with any labor union regarding employee wages, duties, work schedules, benefits, seniority, or grievance procedures. Thus, the City claims that the EES Board's entering into collective bargaining negotiations and agreements such as the Labor Codes with the IBEW exceeded its statutory authority. The City therefore asserts that the Labor Codes were void ab initio.

In support of this contention the City discusses at length Tennessee case law that has addressed the scope of municipality authority relative to the state's sovereign powers, in which we have repeatedly held that municipal powers are limited in nature to only those expressly delegated or necessarily implied by statute or otherwise. *See, e.g., City of Lebanon v. Baird*, 756 S.W. 2d 239 (Tenn. 1988); *Weakley County Mun. Elec. Sys. v. Vick*, 309 S.W.2d 792 (Tenn. Ct. App. 1957).

In the *Weakley County* opinion, we quoted the decision of the trial court and concurred in the ruling:

> The question that the Court must . . . decide . . . [is] . . . whether or not the complainant can lawfully enter into a collective bargaining agreement with its employees and can legally contract with a labor organization. . . . The Court . . . is of the opinion that there is a difference between a municipality even while engaged in a proprietary act than that of a private corporation engaged in a similar business; that the employees of a municipality occupy a different relationship to the employer than do the employees of a private or individual corporation; and that the employees of a municipality do not have the freedom to contract as do the employees of a private business, nor does the municipality likewise have the freedom of action in the relationship to labor of employees that a private business has. The municipality is limited and circumscribed by the fact that it is a governmental agency. The result is, *the Court is of the opinion that the complainant owning and operating the electric plant of a municipality under the Public Acts of Tennessee of 1935, Chapter 32, and likewise under the authorities cited and the examination of the holdings of the Court, cannot lawfully enter into a collective bargaining agreement with its employees, and cannot and could not make a contract with its employees as a labor union . . . .*

309 S.W.2d at 802 (emphasis added).

In *Local Union 760*, 2000 WL 1801856, we affirmed a trial court decision that had determined a collective bargaining agreement entered into between the IBEW and the City

-13-

of Harriman was "null and void." *Id.* at *1. We found that there was no "express or implied authority, either by statute or under the [city] charter, . . . to engage in collective bargaining or to enter into a collective bargaining agreement" with the union. *Id.* at *3. Consequently, we concluded the collective bargaining agreement between the parties to be "void and unenforceable."[4]

The federal courts have weighed in on this issue as well. In *Kraemer v. Luttrell*, 189 Fed. Appx 362, 2006 WL 1133290 (6th Cir. 2006), the Sixth Circuit Court of Appeals observed as follows:

> In 1957, the Tennessee Court of Appeals held that *a municipality cannot enter into an enforceable collective bargaining agreement with its employees. Weakley County Mun. Elec. Sys. v. Vick*, 43 Tenn. App. 524, 309 S.W.2d 792, 802 (1957). Shortly after *Weakley* was decided, the Tennessee Supreme Court expressed that *Weakley accurately reflected Tennessee's public policy. Keeble v. City of Alcoa*, 204 Tenn. 286, 319 S.W.2d 249, 251-52 (1958). A later opinion by the Tennessee Supreme Court acknowledged *Weakley's* holding and noted that *Tennessee had no general statutory provision authorizing municipalities to engage in collective bargaining with their employees. Fulenwider v. Firefighters Ass'n Local Union 1784*, 649 S.W.2d 268, 270 (Tenn. 1982). A more recent unpublished opinion of the Tennessee Court of Appeals continued to follow *Weakley. Local Union 760 Int'l Bhd. of Elec. Workers v. City of Harriman*, No. E2000-00367-COA-R3-CV, 2000 WL 1801856, at *2-3 (Tenn. Ct. App. E.S., Dec. 8, 2000); *See also* 1 Tenn. Juris. *Labor* § 14 (2004).
>
> Several authors have suggested that the statements in *Weakley*, *Keeble*, and *Fulenwider* regarding the enforceability of these contracts are dicta and have argued that such contracts should be enforceable, noting a trend toward permitting bargaining for municipal employees in other jurisdictions. . . . However, *there has been no indication of a change in this policy as it applies to this case from the Tennessee courts or the legislature*, the authorities we must follow in assessing how the Tennessee Supreme Court would decide this question. Moreover, we are authorized to consider the dicta of the Tennessee

---

[4]The Retirees contend that our pronouncement was dicta in the context of a labor union's demand that unwanted negotiations take place. They also argue that the *Local Union 760* Court did not address the liberal powers authorized by the Electric Plant Law to do "all things necessary or convenient." We find the contention that collective bargaining between a municipality and a union might be valid as long as it did not result from a *demand* by a union a distinction without a difference.

Supreme Court in determining how it would decide this matter. *Given the latest pronouncements of the Tennessee Supreme Court and the Tennessee Court of Appeals, we must conclude that the Tennessee Supreme Court would continue to hold that contracts between municipalities and labor organizations are unenforceable under Tennessee law.*

*Id.*, 2006 WL 1133290, at *2-3 (some citations omitted) (emphasis added). More recently, in *Aldridge v. City of Memphis*, No. 08-2019-STA, 2009 WL 1148366 (W.D. Tenn. Apr. 28, 2009), the United States District Court for the Western District of Tennessee observed: "It appears to be well-settled under Tennessee law that a municipality cannot enter into an enforceable collective bargaining agreement with its employees absent some express authority granted by a municipal charter or state statute."[5] *Id.*, 2009 WL 1148366, at *4.

Although opinions of the Attorney General are not binding on the court, they are relied upon by government officials and are therefore entitled to considerable deference. *See State v. Black*, 897 S.W.2d 680, 683 (Tenn. 1995). The Attorney General has discussed how the public employer differs from the private employer in that the public employer cannot bind the future exercise of legislative authority:

[T]he prevailing view is that absent express or implied authority, a public employer cannot enter into a collective bargaining agreement. This statement of the common law has been followed by the Tennessee Courts and as such, represents the status of the law in Tennessee. The decisions of the courts in most jurisdictions reflect that any departure from the common law, to the extent that authority can be implied, is a matter of great public policy. If the courts were to imply such authority it would constitute "judicial legislation." Since public employer-employee relationships are a matter properly addressed by the legislature, the legislature should formulate any change in policy.

Tenn. Op. Atty Gen. No. 79-172, 1979 WL 33782 (Tenn. A.G.). In another opinion nearly twenty years later, the Attorney General noted as follows:

While public employees have the right to form associations, and to meet and confer with their employers regarding employment matters, neither the

---

[5]The district court remanded the case back to the Chancery Court of Shelby County after finding that the matter "presents an issue of first impression under Tennessee law, that is, whether a court may refuse to enforce an arbitration award against a municipality where the municipality submitted itself to arbitration but did so pursuant to an otherwise unenforceable contract with a labor organization." 2009 WL 1148366, at *5.

employees nor the organizations they may form have the authority to engage in collective bargaining with their employer. As recently as 1982, the Tennessee Supreme Court reaffirmed the general principle that, absent express statutory authority, a local government is without authority to enter into a collective bargaining agreement.

Tenn. Op. Atty Gen., No. 98-168, 1998 WL 661332 (Tenn. A.G.). The Attorney General's opinion notes that only two Tennessee statutes authorize collective bargaining and binding collective bargaining agreements between local governments[6] and unions – Tenn. Code Ann. §§ 49-5-601 to 613, the "Education Professional Negotiations Act,"[7] and Tenn. Code Ann. §§ 7-56-101 to 109, involving public transit workers' unions.[8] 1998 WL 661332, at *2.

The Retirees contend that the Electric Plant Law contains three provisions that "liberally" grant the governing boards of municipal electric plants full power to do anything they may deem to be "necessary or convenient" to carry out their mandate, which is to establish and then to operate governmentally owned electric power utilities in Tennessee:

- Tenn. Code Ann. § 7-52-134(b) provides:

  This part is remedial in nature and the powers hereby granted shall be liberally construed to effectuate the purpose of this part, and, to this end, every municipality shall have power to do all things necessary or convenient to carry out the purposes of this part in addition to the powers expressly conferred in this part.

- Tenn. Code Ann. § 7-52-103(a)(9) empowers municipalities to:

  Do all acts and things necessary or convenient to carry out the powers expressly given in this part.

- Tenn. Code Ann. § 7-52-114(c) specifically grants the governing boards of municipal electric power plants the authority to exercise:

---

[6]The National Labor Relations Act specifically exempts public governmental employers and employees. *See* 29 U.S.C. § 152(2).

[7]Passed by the legislature in 1978.

[8]The Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 to 1618 (1976), required states to allow mass transit workers to engage in collective bargaining with cities as a precondition to qualifying for federal mass transit funds.

> [w]ithin the limits of the funds available, all powers to acquire, improve, operate and maintain, and to furnish electric service, and all powers necessary or convenient to furnishing electric service . . . .

The Retirees assert that the EES Board, as a "supervisory body" appointed by the City, was authorized pursuant to Tenn. Code Ann. § 7-52-114(c) to exercise "all powers to acquire, improve, operate and maintain, and to furnish electric service, and all powers necessary or convenient to furnishing electric service . . . on behalf of the municipality . . . ." Therefore, according to the Retirees, the EES enjoyed the equivalent statutory powers as the City as otherwise conferred by the enactment of the Electric Plant Law, having been granted broad residual powers "on behalf of" the City, unless the City itself expressly further limited these powers by resolution or otherwise. With such power, the Retirees contend that the involvement of the EES Board and the superintendents[9] with the IBEW regarding employee wages and working conditions was "necessary or convenient" for the continued and uninterrupted furnishing of electric service. The Retirees note that the EES Board clarified its stance on labor conditions and relations when it officially declared in 1945 that:

> In the opinion of said Board, it is of great importance that the relations between said system and its employees, be satisfactory both to the System, its patrons, and said employees, and that the wages, working conditions, etc., be fair and equitable both to the system and to the employees, not subject to the caprice of either the employee or the management, and that such situation can best be obtained by definite rules and regulations enacted and promulgated by this Board.

The Retirees further assert that Tenn. Code Ann. § 7-52-103(a)(7) clearly provides for a municipality's authority to:

> make all other contracts and execute all other instruments as in the discretion of the municipality may be necessary, proper or advisable in or for the furtherance of the acquisition, improvement, operation and maintenance of any electric plant and the furnishing of electric service; and carry out and perform the covenants and terms and conditions of all such contracts and instruments . . . .

---

[9]The superintendent is authorized under the Electric Plant Law to "appoint all employees and fix their duties and compensation . . . ." Tenn. Code Ann. § 7-52-117(b).

-17-

The City responds that prior to the federal Wagner Act in 1935 and the National Labor Relations Act in 1945, legislation allowing collective bargaining was nonexistent. Accordingly, the City asserts that the drafters of the Electric Plant Law could not have contemplated that collective bargaining should be "anticipated" as appropriate or necessary under the residual authority subsections of the statute.

Instructive on the issue before us is *Allmand v. Pavletic*, 292 S.W.3d 618 (Tenn. 2009), in which the Tennessee Supreme Court addressed a breach of contract claim involving the former superintendent for a municipal utility. The contract at issue provided the former superintendent to post-termination salary and benefits for a multiple-year period. The municipal charter provided, inter alia, that "all proper and necessary contracts" shall be made. *Id.* at 621. Quoting *City of Nashville v. Sutherland*, 21 S.W. 674, 676-77 (Tenn. 1893), the Court discussed the powers of municipalities:

> "Municipal corporations represent the public, and are themselves to be protected against the unauthorized acts of their officers, when it can be done without injury to third parties . . . . The protection of public corporations from such unauthorized acts of their officers is a matter of public policy, in which the whole community is concerned." . . . That a municipal corporation cannot and should not be bound by an ultra vires contract is a proposition that is well settled by authority, and sustained by reason and justice. To hold otherwise would be to vastly enlarge the authority of public agents, and permit them to bind a municipal corporation by contracts absolutely prohibited by law, and would thus expose the public to evils and abuses that the limitations and restrictions thrown around corporate officers are intended to prevent.

*Id.* at 626. The *Allmand* Court noted that "[w]hen a municipality fails to act within its charter or under applicable statutory authority, the action is ultra vires and void or voidable." *Id.* (citations omitted).

In support of his position that he was entitled to certain post-termination benefits, Mr. Allmand relied upon Tenn. Code Ann. § 7-52-103(a) of the Electric Plant Law, by which a municipality is empowered to

> (1) Acquire, improve, operate and maintain . . . an electric plant and to provide electric service to any person, firm, public or private corporation, or to any other user or consumer of electric power and energy . . . ;

* * *

-18-

(7) Make contracts and execute instruments containing such covenants, terms and conditions as in the discretion of the municipality may be necessary, proper or advisable for the purpose of obtaining loans from any source, or grants, loans or other financial assistance from any federal agency; make all other contracts and execute all other instruments as in the discretion of the municipality may be necessary, proper or advisable in or for the furtherance of the acquisition, improvement, operation and maintenance of any electric plant and the furnishing of electric service . . . .

* * *

(9) Do all acts and things necessary or convenient to carry out the powers expressly given in this part.

Tenn. Code Ann. § 7-52-103(a); Mr. Allmand also relied upon Tenn. Code Ann. § 7-52-134, the code provision that permits municipal authorities to "do all things necessary or convenient to carry out the purposes of this part in addition to the powers expressly conferred in this part" and that requires the powers granted by the Electric Plant Law be "liberally construed to effectuate the purposes of this part." Tenn. Code Ann. § 7-52-134.

Unlike the case before us, the Supreme Court in *Allmand* was able to resolve the issue before it by citation to a specific code provision, whereby the Court determined that the "general" provisions of the Electric Plant Law cited by Mr. Allmand did not prevail over more specific provisions of the Tennessee Code and restrictions in the City Charter to allow the municipality to enter into an improper contract. *Id.* at 628. Under the facts of our case, we conclude that the general provisions of the Electric Plant Law relied upon by the Retirees may not prevail over the prior holdings of the Tennessee Supreme Court and this court that a municipality in this state cannot enter into a collective bargaining agreement with a labor union. In our view, the general powers to perform all functions necessary or convenient for the furnishing of electric power does not authorize us to overturn decades-old case law and imply that a municipality may engage in collective bargaining with a labor union. Further, as the legislature has provided a structured statutory framework to govern collective bargaining in the realms of education and transportation, we find the legislative silence on this issue in the Electric Plant Law equates to the general assembly's desire to prohibit collective bargaining in the public utilities sector. We agree with the holding of the Sixth Circuit in *Kraemer v. Luttrell* that the "Tennessee Supreme Court would continue to hold that contracts between municipalities and labor organizations are unenforceable under Tennessee law." 2006 WL 1133290, at *3. As noted by the Attorney General, for this court to imply the authority exists in the general provisions of the Electric Plant Law for the City to engage in collective bargaining with a labor union would constitute "judicial legislation." This we

-19-

decline to do.

Accordingly, we conclude that the trial court erred in the ruling that the EES Board's recognition and negotiation with the IBEW, resulting in the Labor Codes at issue, was not in excess of the Board's broad "necessary or convenient" residual powers. Since each Labor Code was ultra vires and void at its inception, the trial court's ruling that the Labor Codes were "good and in existence" at the time of the ruling was in error.

## V. CONCLUSION

The judgment of the trial court is reversed. Costs on appeal are taxed to the appellees, William (Bob) Simerly and Lewis Honeycutt. This case is remanded, pursuant to applicable law, for such further proceedings as are necessary.

_____
JOHN W. McCLARTY, JUDGE