# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 22, 2014 Session

## MICHAEL O'NEIL v. CLINICALLY HOME, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 121007III      Ellen Hobbs Lyle, Chancellor**

---

**No. M2013-01789-COA-R3-CV - Filed July 16, 2014**

---

The Chief Executive Officer of a Company and the Company executed an Employment Agreement that covered, among other issues, consequences of termination with or without cause, either by the Officer or by the Company.  A year or so later, the Officer called a meeting and issued an ultimatum to the board of directors threatening to resign if certain changes were not made.  The Company later wrote a letter to the Officer accepting his resignation without "Good Reason" as defined in the Employment Agreement.  The Officer asserted the Company terminated him "without cause" and that he did not resign.  The Company responded that it did not terminate the Officer, but simply accepted his resignation. The Officer filed a complaint seeking severance pay and other benefits he claimed he was entitled to pursuant to the Employment Agreement.  The trial court agreed with the Officer and granted his motion for summary judgment.  The Company appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

LAURENCE M. MCMILLAN, JR., SP. J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Mary Dohner Smith, Marcia Dawn McShane, Peter A. Malanchuk, Nashville, Tennessee, for the appellant, Clinically Home, LLC.

Steven Allen Riley, James Nathaniel Bowen, Nashville, Tennessee, for the appellee, Michael O'Neil.

## OPINION

### I. BACKGROUND

Michael O'Neil was hired as the Chief Executive Officer of Clinically Home, LLC, ("Clinically Home" or the "Company") in November 2010. Mr. O'Neill and the Company executed an Employment Agreement that set forth, *inter alia*, the terms of Mr. O'Neil's employment, his compensation, and consequences of his resignation or termination by the Company.

On January 4, 2012, Mr. O'Neil called a special meeting of the Company's board of directors that was held telephonically.[1] During this meeting, Mr. O'Neil expressed concerns he had about the way the Company was being operated and his responsibilities and duties as an officer of the Company. Mr. O'Neil indicated his intention to resign if the board did not make certain changes that he identified. Specifically, Mr. O'Neil said,

> I'm in a position where I'm materially diminished in terms of my responsibilities and duties in the sense that I'm being asked to support actions which I feel are not in the best interest of Clinically Home. And if that's the case, I would resign for that reason.
>
> . . . . .
>
> I think I am fully willing and committed to going forward with disinterested members of the board with the company, if we make the changes or the remedy that I have described. Short of that, I don't feel I have a choice, based upon what I believe is my fiduciary responsibility to protect the resources of the company. I don't feel like I have a choice.

Another board member asked Mr. O'Neil the following:

> [I]f you get to that point where you feel like you're compelled to resign, do you think you're resigning for good reason, and we would owe you severance? Or do you -- are you just resigning and off to do whatever you want to do, you don't see any claims against the company or anything like that?

---

[1]The meeting was recorded, and a transcript of the meeting is included in the record.

Mr. O'Neil responded,

No. I do think I'm resigning with good reason. I'm not talking about the terms of that, but, yes, I feel I'm resigning principally because of the two issues. One is what I believe is a conflict of my fiduciary responsibility, and the second is what has been a *de facto* diminishment of my responsibilities and duties as assigned to me when I took the position to a number of factors, including the direction that we took in business development.

In response to further questioning, Mr. O'Neil explained,

I, based upon what's occurred to this point, cannot in good conscience ask for others to add capital, for others to come into this company and trust it with their -- with their patients and their resources, or ask other talent to come in with the current board structure.

So the remedy that, in my mind, addresses that, such that the company can run full speed ahead in the direction that I think is in the best interest of all the shareholders, is for the board -- for the composition of the board to change.

Another board member then said:

I think, you know, there's a decision to be made. You know, I mean, there is something being presented around, again, I'll call it an ultimatum, and got to understand what the implications of those decisions are.

A different board member added:

Yeah. I think -- I mean, this is a -- this is a very serious issue the way it's been presented. So I think, you know, if it centers around a fiduciary duty issue and it centers around potential resignation for good reason, I think we need to, you know, treat it accordingly. And so I think we need to do the requisite analysis and evaluation with the help of counsel.

According to a declaration by Bob Yungk, one of the Company's board members who ultimately succeeded Mr. O'Neil as the Chief Executive Officer, the Company had a meeting after the telephone meeting to which Mr. O'Neil was not invited. This meeting was not transcribed. According to Mr. Yungk, the Company decided at that meeting to reject Mr. O'Neil's suggestion that certain individuals leave the Company's board of directors. The Company also decided to accept Mr. O'Neil's resignation. Mr. Yungk stated in his affidavit,

Because O'Neil did not have "Good Reason" to resign pursuant to the Employment Agreement, O'Neil's resignation was a "Termination by Executive Without Good Cause" pursuant to Section 4(g) of the Employment Agreement. This is because O'Neil did not have "Good Reason" as defined in his Employment Agreement. Specifically, there was not a diminution of O'Neil's current position, a material reduction in O'Neil's base salary and O'Neil was not required to relocate his principal place of business more than 35 miles. In short, it was clear that O'Neil's resignation, if accepted, could not be a resignation for "Good Reason." Instead, it would be a resignation without good reason or "Termination by Executive Without Good Reason" as defined in Section 4(g) of O'Neil's Employment Agreement.

The Company sent a letter to Mr. O'Neil dated January 11, 2012, purporting to accept his resignation as Chief Executive Officer of the Company, effective January 9, 2012. The relevant portion of the letter stated:

As you know, on Monday, January 9, 2012, on a conference call of the Board of Managers (the "Board") of Clinically Home, LLC ("Clinically Home" or the "Company"), the Board accepted your resignation as Chief Executive Officer of the Company, effective January 9, 2012.

As discussed on Monday, the Board finds no support for and disagrees with your suggestion on the January 4, 2012 Board conference call that your resignation would be for "Good Reason," as such term is defined in that certain Employment Agreement, dated November 1, 2010, by and between Clinically Home and you (the "Employment Agreement"). Consequently, in connection with your resignation without Good Reason, under Section 4(g) of the Employment Agreement, the Company shall remit to you only any unpaid Accrued Obligations through January 19, 2012, which is ten (10) days from January 10, 2012.

## II. TRIAL COURT PROCEEDINGS

Mr. O'Neil filed a complaint against the Company in July 2012 asserting breach of contract. Mr. O'Neil asserted that the Company terminated his employment without "cause," as that term is defined in the Employment Agreement. As a result, Mr. O'Neil claims he is entitled to severance and other benefits as set forth in the Employment Agreement. Mr. O'Neil sought compensatory damages as well as reasonable costs and attorneys' fees, based on the terms of the Employment Agreement.

The Company denied that it terminated Mr. O'Neil. According to the Company, Mr. O'Neil resigned without Cause. Based on the terms of the Employment Agreement, the Company took the position that Mr. O'Neil is not entitled to any damages or to reasonable costs or attorneys' fees.

The parties engaged in discovery, and Mr. O'Neil filed a motion seeking summary judgment in February 2013. The trial court issued a Memorandum and Order granting Mr. O'Neil's motion. The trial court made the following pertinent findings of fact:

3. On January 9, 2012, in a conference call meeting, the Board voted to "accept" the plaintiff's "voluntary resignation without Good Reason," and appointed a new CEO.

. . . . .

5. Section 4 of the Employment Agreement governs termination of the plaintiff. In that section both parties acknowledge that the plaintiff's employment is at will and that either party may terminate the relationship at any time.

6. Section 4, as well, lists the seven ways termination of plaintiff's employment can occur, and, for each, specifies the amount of compensation, if any, for that particular event of termination.

7. Of the seven ways section 4 of the Employment Agreement lists for termination, three of those undisputedly are not relevant: 4(c), (d), and (h), respectively, disability, death and discontinuance of the business.

8. The remaining four listed events of termination are (b) "Termination by Company for Cause"; (e) "Termination Without Cause"; (f) "Termination by Executive for Good Reason"; and (g) "Termination by Executive Without Good Reason."

9. As to these remaining four, written notice is required to put each into effect.

10. It is undisputed that the only party who prepared and submitted a writing regarding termination of the plaintiff's employment was the defendant with the January 11, 2012 letter . . . .

11. Accordingly, as the plaintiff never provided written notice, the resignation provisions of items 4(f) and (g) were never activated, and "Termination by the Executive," plaintiff, is not, as a matter of law, a possible outcome, and may be eliminated.

12. Left are sections 4(b) and (e) termination by the Company, respectively, "for Cause" or "Without Cause."

13. Section 23(b) of the Employment Agreement defines "Cause" as:

(b) "*Cause*" means:

(i) any conduct which the Board has reasonably determined constitutes a felony under applicable law;

(ii) gross negligence or gross incompetence by the Executive in the performance of his duties to the Company after the expiration of ten (10) days without cure after written notice of such negligence or incompetence.

(iii) fraud, embezzlement, theft, dishonesty, immoral or disreputable conduct of a material nature by the Executive against the Company;

(iv) a material breach of any covenant or condition under this Agreement or any other agreement between the parties after the expiration of ten (10) days without cure after written notice of such breach;

(v) material violation of any Company policy or any act of misconduct in either case causing material harm to the Company or its reputation;

(vi) refusal to follow or implement a clear and reasonable directive of the Board after the expiration of ten (10) days without cure after written notice of such refusal; or

(vii) breach of fiduciary duty.

14. None of these "for Cause" items are stated in the January 11, 2012

defendant's written notice of termination as required, under section 4(j): "written notice shall specify the circumstances relied on to support the decision to terminate." In the absence of specification of a section 4(j) "for Cause" item, the termination in issue does not fit within section 4(b) "Termination By Company For Cause."

15. Thus, by process of elimination, the only remaining event of termination, from the foregoing application of the Employment Agreement to the undisputed facts, is section 4(e) "Termination Without Cause." This section 4(e) event, the Court concludes, as a matter of law, is the applicable category of termination in this case.

The trial court addressed the Employment Agreement's requirement for a writing in the event of either the employee's resignation or the employer's termination:

The lack of any written notice of O'Neil's resignation, moreover, is not a mere technical or immaterial omission. If, after rejecting O'Neil's concerns, the Company had advised O'Neil that he could either continue as CEO or, consistent with the Employment Agreement, tender written notice of his resignation, there would be no dispute today whether O'Neil had resigned or been terminated. By preemptively "accepting" what it viewed as O'Neil's verbal resignation, however, Clinically Home left the parties embroiled in the very dispute that the written notice requirements of the Employment Agreement were designed to avoid. The requirement for written resignations, in short, prevents Clinically Home from doing precisely what it is trying to do now: terminate O'Neil, then claim that he terminated himself.

Second, even assuming that O'Neil's so-called verbal "ultimatum" could constitute notice of resignation under the Employment Agreement, it is undisputed that O'Neil told the Board that his resignation would be for Good Reason -- not *without* Good Reason, which is what the Company now claims that it "accepted." Under the Employment Agreement, however, the Company does not possess the unilateral authority to "transform" a resignation for Good Reason into a resignation without Good Reason. Quite the opposite. Once O'Neil informed the Company that he intended to resign for Good Reason, the Company had thirty (30) days to examine and cure the circumstances constituting Good Reason, in which case the resignation would not become effective. Once those circumstances were cured (or rejected as without merit), O'Neil then had a choice: continue with his employment, or give notice of his intent to resign without Good Reason. The Company's argument, however,

denies O'Neil that choice and, instead, gives it the sole and unilateral discretion to "accept" resignations without Good Reason *that were never made*. Just as one who receives an offer to enter into a contract cannot *both* re-write that offer *and* accept it, the Company cannot simultaneously re-write and accept a resignation from O'Neil. It could have rejected O'Neil's resignation for Good Reason as baseless, forcing him to litigate the question of whether he had a Good Reason, or to continue working. It could have accepted his resignation for Good Reason as valid and paid him the benefits to which he was entitled under the Employment Agreement. What it could not do, however, was unilaterally re-characterize O'Neil's resignation as one without Good Reason and then "accept" it.

The trial court then explained why it rejected the Company's contention that it terminated Mr. O'Neil for "cause":

> In order to terminate O'Neil for Cause under Paragraph 4(b) of the Employment Agreement, the Company was required to provide O'Neil with written notice specifying the circumstances relied on to support the decision to terminate. It is undisputed that Clinically Home did not inform O'Neil on January 9th that he was being terminated for "Cause" or provide him with written notice of the circumstances that formed the basis for such "Cause." In fact, the first time that the Company ever claims to have terminated O'Neil for Cause was in its Answer to the Complaint.

Concluding that the Company terminated Mr. O'Neil without Cause, as defined by the Employment Agreement, the trial court applied the severance provisions of the agreement that applied in the event of an employee's termination without cause and ruled that Mr. O'Neil is entitled to payment of his base salary ($350,000); twelve months of health insurance enrollment funds ($12,298.20); and 62,500 fully-vested profit interests in the Company.

The trial court issued a Final Judgment in August 2013 in which it clarified the money damages Mr. O'Neil was entitled to collect. The court also granted Mr. O'Neil's request for attorneys' fees in the amount of $73,497.50 and costs in the amount of $718.75.

### III. ISSUES ON APPEAL

Clinically Home appeals the trial court's judgment. The Company asserts the trial court erred in granting Mr. O'Neil summary judgment because there are factual disputes regarding (1) whether Mr. O'Neil resigned or was terminated; (2) whether Mr. O'Neil

resigned with or without "Good Reason"; (3) whether Mr. O'Neil's termination was with or without "Cause"; and (4) whether Mr. O'Neil's profit interests in the Company were fully vested pursuant to the Profits Interest Agreement. Clinically Home also appeals the award to Mr. O'Neil of his attorneys' fees and costs.

## IV. ANALYSIS

### A. Standard of Review

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn. 2007). We review the summary judgment decision as a question of law. *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763. Those requirements are that the filings supporting the motion show there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair*, 130 S.W.3d at 764.

The moving party has the burden of demonstrating it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998). In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences to be drawn from that evidence. *Green v. Green,* 293 S.W.3d 493, 514 (Tenn. 2009); *Doe v. HCA Health Services, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

Contract interpretation involves issues of law. *Guiliano v. Cleo, Inc*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, we review a trial court's interpretation of a contract *de novo*, with no presumption of correctness on appeal. *Dick Broad. Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). Appellate courts review the document at issue ourselves to make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Our review is governed by well-settled principles.

The court's role in resolving disputes regarding the interpretation of a contract is to

ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Dick Broad.*, 395 S.W.3d at 659 (citing *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)); *Marcum v. Ayers*, 398 S.W.3d 624, 627 (Tenn. Ct. App. 2012); *Guiliano v. Cleo*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The parties' intent is determined by examining the plain and ordinary meaning of the words contained within the four corners of the contract. *Dick. Broadcasting*, 395 S.W.3d at 659; *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)). If the language used is clear and unambiguous, the literal meaning of the words of the contract controls its interpretation. *Dick Broad.*, 395 S.W.3d at 659; *Allmand*, 292 S.W.3d at 630; *see Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("The intent of the parties is presumed to be that specifically expressed in the body of the contract").

Courts must avoid rewriting an agreement under the guise of interpreting it. *Marcum*, 398 S.W.3d at 629; *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Kwasniewski v. Lefevers*, 2013 WL 3964788, at *3 (Tenn. Ct. App. July 30, 2013), nor will they relieve parties of their contractual obligations simply because these obligations later prove to be harsh or unwise. *Marcum*, 398 S.W.3d at 629; *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

"A determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Marcum*, 398 S.W.3d at 627 (citing *Planters Gin Co.*, 78 S.W.3d at 890). Therefore, when relevant facts are not at issue, contract disputes may be resolved through summary judgment. *Marcum*, 398 S.W.3d at 627; *The Pointe, LLC v. Lake Management Ass'n, Inc.*, 50 S.W.3d 471, 474 (Tenn. Ct. App. 2000).

## B. Contract Claim

Clinically Home contends the trial court erred in granting Mr. O'Neil's motion for summary judgment because significant factual issues remain regarding whether Mr. O'Neil resigned or was terminated. If it was determined that Mr. O'Neil resigned, there would be a question of fact whether his resignation was with "Good Reason," according to the Company. In the alternative, the Company contends, if the Company terminated Mr. O'Neil, there would be a question of fact whether the Company terminated Mr. O'Neil with or without "Cause."

Mr. O'Neil's Employment Agreement includes provisions entitled "Termination By

Company for Cause," "Termination Without Cause," "Termination by Executive for Good Reason," and "Termination by Executive Without Good Reason." Each of these sections requires "written notice" for the termination to be effective. Section 4(j), which is titled "Notice; Termination Date," contains the following requirement: "In the event of a termination for Cause or Good Reason, written notice shall specify the circumstances relied on to support the decision to terminate." Thus, it is clear and unequivocal that if the Company wanted to terminate Mr. O'Neil for Cause, or if Mr. O'Neil wanted to terminate his employment for Good Reason, (1) written notice was required, and (2) to be effective, the written notice was required to specify the circumstances relied upon to support the termination decision.

The parties agree to the following: the Employment Agreement governed Mr. O'Neil's employment by the Company; Mr. O'Neil discussed his separation from the Company during the telephone call on January 4, 2012; and Mr. O'Neil did not give written notice to the Company of any decision by him to terminate his employment. The parties also agree that Mr. O'Neil no longer is employed by Clinically Home.

Because Mr. O'Neil is no longer employed by Clinically Home, either he terminated his employment or the Company terminated his employment.[2] As the trial court noted, the only document that could be considered written notice of Mr. O'Neil's termination is the letter the Company sent to Mr. O'Neil dated January 11, 2012. The effect of the Company's letter was that Mr. O'Neil's employment by Clinically Home was terminated.

We agree with the Company's contention that Mr. O'Neil gave the Company an ultimatum during the telephone conference on January 4, but we disagree with the Company's assertion that Mr. O'Neil resigned during that call. Mr. O'Neil indicated he would resign if certain steps were not followed, but he did not in fact resign. According to the governing document, any resignation by Mr. O'Neil would not be effective without written notice, and Mr. O'Neil did not provide such notice. Thus, we decline to find that Mr. O'Neil in fact terminated his own employment, with or without Good Reason.[3]

Clinically Home refers in its letter to Mr. O'Neil's "resignation without Good

---

[2]Neither party contends the parties mutually agreed that Mr. O'Neil would cease working for the Company.

[3]"Good Reason" was defined to include (1) the assignment to Mr. O'Neil of any duties or responsibilities that would result in the material diminution of his position; (2) a material reduction in Mr. O'Neil's annual base salary; or (3) the relocation of Mr. O'Neil's principal place of business more than 35 miles from its current location.

Reason." However, there is no evidence that Mr. O'Neil ever resigned without Good Reason. Instead, during the telephone conference on January 4, Mr. O'Neil stated, "I do think I'm resigning with good reason." He clarified his position by describing what he perceived to be "a conflict of my fiduciary responsibility" and "a *de facto* diminishment of my responsibilities and duties."

Clinically Home cannot change the terms of an offer, or accept something that is not offered. *See Ray v. Thomas*, 232 S.W.2d 32, 35 (Tenn. 1950) (rule is well-established and uniform that "acceptance of an offer must exactly and precisely accord with the terms of the offer"); *Brown v. Gutierrez*, 2004 WL 2086308, at *3 n.4 (Tenn. Ct. App. Sept. 20, 2004) (purported acceptance must mirror terms of the offer); *Gardner v. Anesthesia & Pain Consultants, P.C.*, 2004 WL 2715304, at *8 (Tenn. Ct. App. Nov. 30, 2004) ("a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested"). There is no evidence that Mr. O'Neil offered to resign without Good Reason. We, therefore, reject Clinically Home's contention that Mr. O'Neil resigned, either with or without Good Reason.

Having established that Mr. O'Neil did not resign, the next question is whether the Company terminated him with or without Cause. The Employment Agreement requires that "[i]n an event of termination for Cause or Good Reason, written notice shall specify the circumstances relied on to support the decision to terminate." The effect of the Company's letter addressed to Mr. O'Neil dated January 11 was to terminate Mr. O'Neil's employment, but it did not specify any circumstances supporting a decision to terminate Mr. O'Neil for Cause. Thus, we hold that Clinically Home terminated Mr. O'Neil Without Cause.

The Employment Agreement specifies the benefits to which Mr. O'Neil is entitled if he is terminated Without Cause. These benefits include twelve months of Mr. O'Neil's base salary, which is $350,000, twelve months of health insurance premiums, which is $12,298.20, and 62,500 of profit interests in the Company.

Clinically Home disputes that Mr. O'Neil is entitled to the profit interests, arguing there is a question of fact regarding whether Mr. O'Neil's termination was substantially based on performance, which would result in the forfeiture of those units. Initially, we note that the Company denies terminating Mr. O'Neil at all. In addition, the record reveals that the Company approached Mr. O'Neil subsequent to his termination and asked him to continue working for Clinically Home as a consultant.[4] This action by the Company belies

---

[4]In an e-mail dated January16, 2012, addressed to Mr. O'Neil, the Company wrote:

(continued...)

its argument that the Company terminated Mr. O'Neil due to his inadequate performance.

Reviewing the evidence presented in the light most favorable to Clinically Home, we conclude there are no genuine issues of material fact and that Mr. O'Neil is entitled to judgment as a matter of law. We affirm the trial court's judgment holding that Clinically Home terminated Mr. O'Neil Without Cause and that Mr. O'Neil is entitled to the damages he was awarded in the trial court.

## C. Attorneys' Fees and Costs

Clinically Home next contends the trial court erred in its award of costs and attorneys' fees to Mr. O'Neil. The Company acknowledges that the Employment Agreement entitles the prevailing party to an award of reasonable costs and attorneys' fees. Clinically Home argues, however, that the amount of fees Mr. O'Neil sought and was awarded was not reasonable.

In awarding Mr. O'Neil costs of $718.75 and attorneys' fees of $73,497.50, the trial court wrote:

> Analyzing the factors set forth in Tenn. R. Sup. Ct. Rule 8, RPC 1.5, the Court finds the fees and costs incurred by Plaintiff's counsel in this case, Riley Warnock & Jacobson, PLC ("RWJ"), to be reasonable. In particular, the Court finds the hourly billing rates of the RWJ attorneys working on this case to be reasonable in relation to the hourly billing rates of other attorneys in this locality with similar experience performing similar work; that James N. Bowen undertook the lead role in drafting the pleadings, discovery and handling of many of the day-to-day matters in this case, while Steve A. Riley -- a more experienced attorney at RWJ who bills at a higher hourly rate -- took a supervisory role; and that the attorney's fees incurred in this case to date are reasonably proportionate to the amount in damages awarded to Plaintiff. The Court also finds that while both Mr. Riley and Mr. Bowen worked together on occasion on a particular issue, such duplication of efforts was limited, reasonable and necessary under the circumstances of this case.

---

[4](...continued)
[W]e would like to explore a potential "win win" relationship that would be consulting in nature and address transitional issues, as well as potential compensation for Clinically Home successfully consummating certain relationships. . . . Finally, we also discussed a "truce" until you and Bob could meet and discuss a win win arrangement . . . .

Rule 8 of the Tennessee Rules of the Supreme Court, RPC 1.5, sets forth the following factors to consider in determining the reasonableness of an attorney's fee:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

The Court of Appeals has noted that the determination of reasonable attorney's fees is a discretionary inquiry, with no fixed mathematical formula. *Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002) (citing *United Med. Corp. of Tenn. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 137 (Tenn. 1986); *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998)). An appellate court will, therefore, not interfere with a trial court's award of attorneys' fees unless there is a showing of an abuse of discretion. *Killingsworth*, 104 S.W.3d at 534; *see Hohenwald Bank*, 703 S.W.2d at 137 (determination of reasonable attorneys' fee is subjective).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining. *Williams v. Baptist Memorial Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006). The abuse of discretion standard of review does not permit an appellate court to substitute its judgment for

that of the trial court. *Id.* at 551. Our Supreme Court has stated, "[T]his Court will not interfere with the allowance of attorney's fees by the trial court unless we can see that some injustice has been perpetrated." *Connors v. Connors*, 594 S.W.2d 672, 677 (Tenn. 1980).

In support of his motion for an award of attorneys' fees, Mr. O'Neil submitted an affidavit by one of his attorneys, Steven A. Riley, in which Mr. Riley stated that the hourly rates charged by his firm were consistent with the rates of attorneys with similar experience performing similar types of work in the area. Mr. Riley submitted excerpts from the National Law Journal's 2008 and 2009 billing surveys showing that the hourly rates he and his associate charged Mr. O'Neil were within the range of hourly rates charged by other lawyers in Nashville back in 2008, which was several years before the litigation in this case.

In addition to its contention that the rates charged by Mr. O'Neil's attorneys were abnormally high, Clinically Home claims the trial court abused its discretion by permitting Mr. O'Neil to recover for duplicative work. The trial court found, however, and we agree, that the amount of duplicative work was limited. The Company has not established how the trial court abused its discretion in determining that Mr. O'Neil's attorneys acted reasonably in working together on certain aspects of the case.

Finally, Clinically Home contends Mr. O'Neil is not entitled to collect fees for time his attorneys spent preparing their motion for an award of fees. We disagree with the Company because the only way Mr. O'Neil could be awarded his attorneys' fees was if his attorneys prepared the necessary documents describing the basis for their fees. The Employment Agreement expressly provides that "the successfully enforcing party shall recover all reasonable costs and attorneys' fees from the other." In the absence of proof that Mr. O'Neil's attorneys did not charge Mr. O'Neil for their time preparing a motion for an award of their fees, we find this time appropriate to include in the overall award of fees.

Clinically Home has failed to establish the trial court abused its discretion in awarding Mr. O'Neil his attorneys' fees and costs in the amount that was awarded. Accordingly, we affirm this aspect of the trial court's award.

## V. CONCLUSION

The trial court's judgment is affirmed in all respects.  Costs of this appeal shall be taxed to the appellant, Clinically Home, LLC, for which execution shall issue, if necessary.

_____
LAURENCE M. McMILLAN, JR., SP. JUDGE